THE STATE OF NEW JERSEY, BY WALTER D. VAN RIPER, ATTORNEY GENERAL, PLAINTIFF-RESPONDENT, v. TRAFFIC TELEPHONE WORKERS' FEDERATION OF NEW JERSEY ET AL., DEFENDANTS-APPELLANTS, AND NEW JERSEY BELL TELEPHONE COMPANY, A CORPORATION, DEFENDANT-RESPONDENT.

Argued May 2, 1949—Decided May 26, 1949.

*Mr. Israel B. Greene* argued the cause for the appellants.

*Mr. Thomas Glynn Walker* (*Messrs. Pilney, Hardin & Ward,* attorneys) argued the cause for the respondent New Jersey Bell Telephone Company.

*Mr. Walter D. Van Riper* (*Mr. Theodore D. Parsons,* Attorney General) argued the cause for the respondent the State of New Jersey.

The opinion of the court was delivered by

VANDERBILT, C. J. The State of New Jersey brought this suit for a declaratory judgment as to the constitutionality of the act dealing with labor disputes in public utilities, *R. S.* 34:13B–1 *et seq.* This court allowed an application for certification of the judgment of the Chancery Division sustaining the constitutionality of the act, on the petition of the defendants Traffic Telephone Workers' Federation of New Jersey, Mary Hanscom, Virginia Wigglesworth and Elizabeth Ryan, in which the State and the defendant telephone company joined.

As originally enacted (*P. L.* 1946, *c.* 38), the statute, after declaring that "heat, light, power, sanitation, transportation, communication, and water are life essentials of the people" and that "the possibility of labor strife in utilities * * * is a threat to the welfare and health of the people," *R. S.* 34:13B–1, assured to the employees of public utilities the right to organize and the right of collective bargaining without interference by the employer (incidentally authorizing a closed shop in these industries) and provided for the determination and certification of the bargaining representatives of the employees of a given craft or class by the State Board of Mediation, *R. S.* 34:13B–2, 3. Other sections of the act

provided for agreements in writing, prior written notice of any changes desired in existing or expired agreements, advisory arbitration procedure in the event of disputes, and finally for seizure by the Governor by taking "immediate possession of the plant, equipment or facility for the use and operation by the State of New Jersey in the public interest," whenever he shall find and proclaim "that there is a threatened or actual interruption of the operation of such public utility as the result of a labor dispute * * * and that the public interest, health and welfare are jeopardized, and that the exercise of such authority is necessary to insure the operation of such public utility," *R. S.* 34:13B–13. The 1946 act did not, however, contain any prohibition against strikes or lockouts after seizure.

At the time of the strike by the members of the defendant union on April 7, 1947, the Legislature amended and supplemented the statute by two separate enactments (*P. L.* 1947, *c.* 47 and *c.* 75, effective, respectively, on April 9th and April 22nd). The present controversy centers around certain sections of this legislation, which must, for clarity, be quoted at length:

"34:13B–18. *Sixty-day notice of intention to strike.* It shall be unlawful for any employee or representative of any craft, class or group of employees of a public utility to institute, participate in or aid in the conduct of a strike or work stoppage or for a public utility or any officer, agent or representative thereof to institute, participate in or aid in any lockout until sixty days shall have elapsed after written notice of intention to institute, participate or aid in the conduct of a strike or work stoppage or lockout has been served by the employee or representative intending to institute, participate in or aid in a strike or work stoppage or the public utility intending to institute, participate in or aid in a lockout upon the State Board of Mediation and the other party to the dispute. Said notice may be served on or after but not before the termination of the collective bargaining agreement between the parties and in cases where no such collective bargaining agreement exists, may be served at or after but not before the expiration of the notice of desired changes required to be served under the provisions of the act which this act supplements. During the aforementioned sixty-day period it shall be the duty of all parties to continue their endeavors in good faith to reach an agreement and said sixty-day period may be extended by written agreement of the parties, filed with the State Board of Mediation."

"34:13B–19. *Strike after seizure*. After the Governor has taken or shall take possession of any plant, equipment or facility of any public utility for the use and operation by the State of New Jersey in the public interest, pursuant to the provisions of section thirteen of the act which this act supplements, and during the continuance of such possession, the relationship between the Government of the State of New Jersey and the persons employed at such public utility, except those who elect to quit such employment, shall be that of employer and employee; and during the continuance of such possession it shall be unlawful for any person employed at such plant or facility to participate in or aid in any strike, concerted work stoppage or concerted refusal to work for the State as a means of enforcing demands of employees against the State or for any other purpose contrary to the provisions of this act."

"34:13B–20. *Board of arbitration; submission to Board*. Within ten days after the Governor has taken or shall take possession of any plant, equipment or facility of any public utility pursuant to the provisions of section thirteen of the act which this act supplements, or within ten days after the effective date of this act, whichever is later, any and all disputes then existing between the public utility and the employees shall be submitted to a Board of Arbitration to be constituted within such ten day period as follows: the management of such public utility and the representatives of such employees shall each designate in writing one person to serve as a member of such Board of Arbitration and file such designation with the State Board of Mediation; the two persons so designated shall choose three disinterested and impartial persons and shall file such designations with the State Board of Mediation, and the five thus appointed shall compose, and act as the Board of Arbitration. * * *"

*R. S.* 34:13B–21 then states that the "Board of Arbitration shall promptly proceed to arbitrate the matters submitted to it * * * (and) it shall promptly hold hearings * * *," and *R. S.* 34:13B–22 requires the Board "to make written findings of fact and to promulgate a written decision and order upon the issue or issues" within thirty days after submission of the matters in dispute or such additional period as may be agreed upon by a majority of the members of the Board. *R. S.* 34:13B–23 gives binding and conclusive effect to the findings, decision and order of the Board of Arbitration and provides for an appeal therefrom by any party to the former Supreme Court. The statute then recites:

"34:13B–24. *Lockout, strike or work stoppage; penalty*. Any lockout, authorized or engaged in, by any public utility in violation of any provision of this act, or any failure or refusal by a public

utility to abide by the terms of any decision or order made by any Board of Arbitration constituted in accordance with the provisions of this act, or any strike or concerted work stoppage, authorized or engaged in, or continued to be engaged in by any labor union or representative of any craft, class or group of employees of a public utility, or any concerted action on the part of a substantial number of the members of any labor union resulting in an interruption of the operation of any public utility, in violation of any provision of this act or in connection with any refusal to abide by the terms of any decision or order made by any Board of Arbitration constituted in accordance with the provisions of this act, shall subject such public utility and any officer or agent thereof participating or aiding therein or such labor union or representative of any craft, class or group of employees of a public utility to a penalty in the sum of ten thousand ($10,000.00) per day for each day during the period of such lockout, strike or concerted work stoppage, such penalty to be recovered in the name of the State in an action at law in any court of competent jurisdiction."

"34:13–B25. *Violations.* Any officer or agent of any public utility or labor union, or any person performing the duties of such officer, or agent, who shall willfully violate, or aid and abet the violation of any of the provisions of this act, or attempt to do so, shall, for each such offense, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than twenty-five dollars ($25.00) nor more than two hundred fifty dollars ($250.00). Each day's continuance of the violation shall constitute a separate offense."

Under *Chapter* 47 the penalties prescribed in *R. S.* 34:13B–25 included imprisonment and a fine ranging between $250 and $500, but by chapter 75 the penalty of imprisonment was eliminated and the scale of fines reduced to from $25 to $250 a day.

The facts in the case were stipulated by the parties at the time of the hearing in the Superior Court. It appears that the defendant union represents approximately 12,000 telephone operators employed by the defendant New Jersey Bell Telephone Company, and that the individual defendants were members and officers of the union. Following a breakdown in negotiations between the union and the telephone company over the terms of a contract to replace a previous agreement which expired on March 31, 1947, the defendant union as well as other unions went out on strike on April 7, 1947, against the telephone company and commenced picketing the various offices and buildings of the telephone company in the

State. Thereupon the Governor, acting under the 1946 statute, issued an executive order on the same day authorizing the Commissioner of Labor to seize and take possession of the property and facilities of the telephone company and invested him with broad powers to manage and carry on the operations of the telephone company. Immediately thereafter the Commissioner of Labor served the executive order upon the telephone company and stationed himself and his representatives at the main offices of the telephone company in Newark and at various other offices in the State. Although he and his representatives remained throughout the duration of the strike, aside from arranging for the cooperation of state and local law enforcement agencies and observing the progress of the strike, the Commissioner of Labor engaged in no activity whatever, neither interfering with nor participating in the management or operations of the company.

*P. L.* 1947, *c.* 47, above referred to, passed the Legislature on April 6th and was signed by the Governor on April 9th. Two days later, on April 11th, the individual defendants were arrested and charged with a violation of chapter 47 for aiding, abetting and counselling persons to participate in the strike, and the State also commenced a civil action against the union to recover the $10,000 penalty prescribed in *R. S.* 34:13B–24. The telephone company designated its representative to serve as a member of the Board of Arbitration, but the defendant union declined to participate in the arbitration proceedings, and on April 14th initiated a proceeding in the United States District Court for the District of New Jersey to test the constitutionality of the legislation. The Attorney General thereupon commenced the present proceeding on April 18th, obtaining in connection therewith a preliminary restraint against the enforcement of the legislation directed to himself, the Commissioner of Labor and all other state enforcement agencies pending the determination of this suit. He also procured a dismissal of the criminal complaints against the individual defendants and the federal court stayed proceedings there to permit the issues to be litigated in the State courts.

The legislation is challenged by the defendant Union as a prohibition against strikes and picketing in violation of the constitutional guarantees of freedom of speech, freedom of the press and freedom of assembly, as set forth in the First and Fourteenth Amendments to the Federal Constitution, as requiring compulsory arbitration, as denying to its members the equal protection of the laws and as depriving the union and its members of their liberty to contract and of their property without due process of law under the Fourteenth Amendment. It is also maintained that the statutes in question are unconstitutional under Article VI of the Federal Constitution in that they impinge upon a field that has been pre-empted by the federal government and it is objected that the legislation imposes involuntary servitude under the Thirteenth Amendment.

As to the charge that the legislation is unconstitutional in prohibiting picketing, it is sufficient to observe that there is no provision in the statutes under review prohibiting picketing. This contention is therefore clearly without merit.

None of the provisions of the First or Fourteenth Amendments of the Federal Constitution is absolute. To quote Mr. Justice Holmes in *Hudson County Water Co. v. McCarter,* 209 *U. S.* 349, 355, 28 *S. Ct.* 529, 52 *L. Ed.* 828, 832 (1908):

> "All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the State. The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side."

The same reasoning applies with even greater force to the broad, general constitutional guarantees asserted here, *Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940, 89 *A. L. R.* 1469 (1934); *Kovacs v. Cooper,* 336 *U. S.* 77, 69

*S. Ct.* 448, 93 *L. Ed.* (*ad. ops.*) 379 (1949); *State Board of Milk Control* v. *Newark Milk Co.,* 118 *N. J. Eq.* 504 (*E. & A.* 1935).

The fact that the legislation here dealt with and the rights affected thereby involve matters arising out of labor disputes does not in anywise affect the proposition that all constitutional guarantees, like all other rights, are subject to reasonable restraint where such restraint is deemed essential to the common good. "But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this court is plain. Whenever state action is challenged as a denial of 'liberty,' the question always is whether the state has violated 'the essential attributes of that liberty.' Mr. Chief Justice Hughes in *Near* v. *Minnesota,* 283 *U. S.* 697, 708, 75 *L. Ed.* 1357, 1363, 51 *S. Ct.* 625. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause that clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals and general welfare of its people. * * * The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' " *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 *U. S.* 722, 725-726, 62 *S. Ct.* 807, 86 *L. Ed.* 1143, 1146-1147 (1942).

██ ██ The public utilities dealt with in the acts under review have long been held to be businesses affected with a public interest and therefore subject to special regulation by the State beyond that imposed on private industry generally. While such regulation of public utilities originally found its justification in the special franchises, often conferring monopolistic privileges, granted to them by the State, the regulation of utilities has long since found a broader justification in the necessities of our citizens for the services of these public utilities for health, safety and even life. Where by reason of

a strike, work stoppage or lockout the flow of the services of any of these essentials of community life is halted or impaired the State has not only the right but a pressing duty to step in and prevent the continuance of such stoppage or impairment and to take appropriate measures to restore them. If instead of a stoppage or curtailment of essential services there is an imminent danger of their being halted or curtailed, the State has the right as well as the obligation of preventing the occurrence of any such catastrophe, *Cf. United States v. United Mine Workers,* 330 *U. S.* 258, 67 *S. Ct.* 677, 91 *L. Ed.* 884 (1947).

The soundness in law of these propositions is not disputed as to public utilities generally, but it is contended that telephone companies are not properly classified with the other public utilities. In the economic and social life of today, however, communication by telephone is a vital and indispensable essential to the health, safety and welfare of the public. Without the almost instantaneous means of communication that the telephone alone furnishes, our system of fire and police protection would be rendered relatively ineffective and the health, safety and indeed the life of the individual citizen would be gravely endangered. It is unrealistic in this day and age to suggest that if the telephone is not available one may send a telegram or a messenger for a physician or a policeman or a fire truck. Any such line of reasoning pressed to its logical conclusion would require the State to surrender all of the advances of modern science for a return to the Stone Age. While it has been stipulated in this case that emergency calls were completed, we will take judicial notice that emergency calls in non-dial areas and long distance calls were often long delayed due to the inadequacy of the numbers of the supervisory staff of the defendant telephone company, who were endeavoring to the best of their limited capacity to supply service. Had the strike continued for any length of time there can be no doubt that long distance calls and emergency calls in non-dial areas would have soon been substantially suspended through the sheer exhaustion of the supervisory staff.

■ ■ It must be recognized that the statutes in question inevitably impinge upon the unfettered exercise of some of the constitutional guarantees asserted by the defendant union, but only out of deference, however, to the paramount significance of other public rights. That, as we have shown, is not an uncommon occurrence in the field of constitutional law. The immediate question is whether or not such restrictions on the absolute application of any constitutional guarantees come within the area delimited in the decisions of the Supreme Court of the United States as the ultimate arbiter of the meaning of the Federal Constitution as justifying such restrictions. The tests that the United States Supreme Court has laid down in this field, and particularly where freedom of speech, freedom of the press, and freedom of assembly are involved, are that such restraints are justifiable only "to prevent grave and immediate danger to interests which the State may lawfully protect" and any such restraints must be reasonable:

"The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interest which the state may lawfully protect." *West Virginia State Board of Education v. Barnette*, 319 *U. S.* 624, 639, 63 *S. Ct.* 1178, 87 *L. Ed.* 1628, 1638, 147 *A. L. R.* 674 (1943).

See, also, *Schneider v. Irvington*, 308 *U. S.* 147, 60 *S. Ct.* 146, 84 *L. Ed.* 155 (1939); *Bridges v. California*, 314 *U. S.* 252, 62 *S. Ct.* 190, 86 *L. Ed.* 192, 159 *A. L. R.* 1346 (1941).

Within the last few months, however, the Supreme Court of the United States, speaking through Mr. Justice Black, has twice reaffirmed the protection which the Federal Constitution affords to state statutes designed to protect the legitimate interests of the state in industrial disputes. Thus in *Giboney v. Empire Storage and Ice Co.*, decided April 4, 1949, 93 *L. Ed.* (*ad. ops.*) 649, 655, it is unanimously held that "No opinions relied on by petitioners assert a constitutional

right in picketers to take advantage of speech or press to violate valid laws designed to protect important interests of society." Again in *Lincoln Federal Labor Union v. Northwestern Iron and Metal Co.,* decided January 3, 1949, 93 *L. Ed. (ad. ops.)* 201, 208, the Supreme Court in reviewing the course of decisions in this field over the last fifteen years held:

"This Court beginning at least as early as 1934, when the Nebbia Case was decided, has steadily rejected the due process philosophy enunciated in the Adair-Coppage line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. See *Nebbia v. New York, supra* (291 *U. S. at* 523, 524, 78 *L. Ed.* 948, 949, 54 *S. Ct.* 505, 89 *A. L. R.* 1469), and *West Coast Hotel Co. v. Parrish, supra* (300 *U. S. at* 392, 395, 81 *L. Ed.* 708-711, 57 *S. Ct.* 578, 108 *A. L. R.* 1330), and cases cited. Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare."

See, also, *International Union U. A. W., A. F. of L. v. Wisconsin Employment Relations Board,* decided February 28, 1949, 93 *L. Ed. (ad. ops.)* 510, 519, where the Court again conceded the right of a state legislature to mark the limits of tolerable industrial conflict in the public interest. Speaking through Mr. Justice Jackson the court said:

"The right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right' and which, as the Court has pointed out, was recognized as such in its decisions long before it was given protection by the Labor Relations Act. *National Labor Relations Bd. v. Jones & L. Steel Corp.*, 301 *U. S.* 1, 33, 81 *L. Ed.* 893, 909, 57 *S. Ct.* 615, 108 *A. L. R.* 1352."

The interests protected by the legislation here under review are far more vital to the welfare of the public than those

which were dealt with by the Supreme Court of the United States in the three cases last cited. In the *Giboney case* the court sustained an injunction against picketing which was being carried on in an effort to compel a distributor to agree not to sell ice to non-union peddlers that, had it been success-ful, would have rendered the distributor liable to prosecution for violation of a state statute prohibiting combinations in restraint of trade. The *Lincoln Federal Labor Union* decision held valid state constitutional and statutory provisions pro-hibiting discrimination in the hiring or retention of an em-ployee by reason of either his membership or non-membership in a labor organization. In the *International Union case* it was held that the state through its labor relations board might quite properly enjoin as an unfair labor practice con-stant and unannounced concerted stoppages of work by the employees of a particular concern as a device to enforce their demands, the court in the course of the opinion expressing its conclusion that neither the National Labor Relations Act nor the Labor Management Relations Act of 1947 conferred upon employees an absolute right to engage in every kind of strike or other concerted action. The legislative enactments here in question concern the rights of substantially every member of the public to a means of communication upon which he has long been accustomed to rely, not to mention various modes of transportation and light, heat and power, which in the industrial, densely populated areas as well as in the rural sectors directly and immediately affect the well-being and life of the individual and the whole of the community.

In the present case the Governor by *Executive Order No.* 4, dated April 7, 1947, found that the strike of the em-ployees of the defendant telephone company existed not only at the main office of the company, but at all of its offices and central exchanges and plants located within the State and "I do further find that as a matter of fact such work stoppage will make it impossible for the above mentioned utility to continue essential and effective operation, and to furnish the people of the State of New Jersey with necessary and essential telephonic communication and, as a result thereof the public

interest of this State would be seriously impaired and interfered with." Bearing in mind that New Jersey is one of the most highly industrialized states in the Union and that a large proportion of its inhabitants live within relatively congested metropolitan and suburban areas, there can be no doubt but that the strike did present a clear and present danger to the welfare of the inhabitants of the State. In the circumstances the Governor's findings of facts are fully justified.

It is claimed that the power inherent in the State to take over a public utility for the general welfare cannot be sustained in view of the fact that the court below found that the statute contemplated merely a *pro forma* seizure by the State that constituted nothing more than a protective custodianship for the owner and that the employees of the defendant telephone company did not become employees of the State "in any ordinary sense, but only in the peculiar or figurative sense intended by the statute." This contention, in view of the foregoing discussion, we deem to be of no importance. The justification of the statute, as we have shown, rests on the ground of clear and present danger that would result to the State from the impairment or cessation of the performance of the functions of a public utility.

The defendant union also challenges the legislation as imposing involuntary servitude in violation of the Thirteenth Amendment to the Federal Constitution. This contention is fully answered by the language of the statute itself, *R. S.* 34:13B–15:

"Under no circumstances shall any employee be required to render, perform or engage in any work, labor or service without his consent; nor shall anything in this act, or in any amendment thereof or supplement thereto, be construed to make the quitting of his work, labor or services by an individual employee an illegal or prohibited act; nor shall any court issue any process to compel the performance by an individual employee of such work, labor or service without his consent."

Far from being the victims of involuntary servitude, the employees of a public utility enjoy a far greater degree of continuity and security of employment than do the employees

of private competitive industry. Public utilities are necessities and while they are sometimes reorganized they rarely are permitted by the State to go out of business. Private competitive industry and its employees, on the other hand, are subject to the hazards of competition in an era where the constant developments of technology as well as shifts in popular demand for their products, among many other causes, frequently force private business to the wall and throw its employees out of their jobs. Dun's Statistical Review for March, 1949, discloses the failure of 61 public utilities the country over from 1941 to 1948, inclusive, out of 36,364 failures of industrial concerns.

 The defendant union contends that the legislation is invalid in that it invades a field which has been pre-empted by the federal government through the enactment of the National Labor Relations Act and the Labor Management Relations Act. Here the basic rule is that the "intention of Congress to exclude the states from exerting their police power must be clearly manifested." *Allen-Bradley Local v. Wisconsin Employment Relations Board*, 315 *U. S.* 740, 62 *S. Ct.* 820, 86 *L. Ed.* 1154 (1942). The contention in the present case would seem to be disposed of by the decision hereinbefore referred to of the United States Supreme Court in *International Union U. A. W., A. F. of L. v. Wisconsin Employment Relations Board*, decided February 28, 1949, 93 *L. Ed.* (*ad. ops.*) 510, 518-519, where, in speaking of the effect of the National Labor Relations Act and of the Labor Management Relations Act upon the power of the states to legislate, the court said:

"This Court less than a decade earlier had stated that law to be that the state constitutionally could prohibit strikes and make a violation criminal. It had unanimously adopted the language of Mr. Justice Brandeis that 'Neither the common law, nor the Fourteenth Amendment confers the absolute right to strike.' *Dorchy v. Kansas*, 272 *U. S.* 306, 311. Dissenting views most favorable to labor in other cases had conceded the right of the state legislature to mark the limits of tolerable industrial conflict in the public interest. *Duplex Co. v. Deering*, 254 *U. S.* 443, 488. This court has adhered to that view. *Thornhill v. Alabama*, 310 *U. S.* 88, 103. The right to strike,

352

because of its more serious impact upon the public interest, is more
vulnerable to regulation than the right to organize and select repre-
sentatives for lawful purposes of collective bargaining which this
Court has characterized as a 'fundamental right' and which, as the
Court has pointed out, was recognized as such in its decisions long
before it was given protection by the Labor Relations Act. *Labor
Board v. Jones & Laughlin*, 301 *U. S.* 1, 33.

"As to the right to strike, however, this Court, quoting the lan-
guage of § 13, has said, 306 *U. S.* 240, 256, 'but this recognition of
"the right to strike" plainly contemplates a lawful strike,—the exercise
of the unquestioned right to quit work,' and it did not operate to legal-
ize the sit-down strike, which state law made illegal and state
authorities punished. *Labor Board v. Fansteel Corp.*, 306 *U. S.* 240.
Nor, for example did it make legal a strike that run afoul of federal
law, *Southern S. S. Co. v. Labor Board*, 316 *U. S.* 31; nor one in
violation of a contract made pursuant thereto, *Labor Board v. Sands
Mfg. Co.*, 306 *U. S.* 332; nor one creating a national emergency,
*United States v. United Mine Workers*, 330 *U. S.* 258."

Thus the power still resides in the states in a proper case
to prohibit strikes notwithstanding the existing federal legis-
lation.

It is further urged by the defendant union that
the penalties provided for by the act are so exorbitant as to
amount to a denial of the equal protection of the laws in
violation of the Fourteenth Amendment. The penalties pre-
scribed are purely economic; there is no provision for punish-
ment by imprisonment. These penalties are designed, how-
ever, to act as a deterrent against the commission of certain
acts which, if permitted to go unchecked, would endanger the
lifelines of society. If this salutary purpose is to be served,
the penalties imposed must be substantial; otherwise the
legislation might be violated with impunity. Nor is the stat-
ute directed specifically at the defendant union so as to in-
validate it as a bill of attainder, and the objection that it is
an *ex post facto* law is equally without substance.

It is contended by the defendant telephone company
that the provisions in the statute providing for compulsory
arbitration are unconstitutional, because they delegate legis-
lative power to an administrative agency without setting up
adequate standards to guide the administrative agency in the
exercise of the powers delegated to it. The argument has

great force. While there is no doubt that the legislature may delegate to an administrative body the exercise of a limited portion of its legislative power with respect to some specific subject matter, such delegation of legislative power must always prescribe the standards that are to govern the administrative agency in the exercise of the powers thus delegated to it. As was said in *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504 (*E. & A.* 1935), at *pp.* 521-522:

"The legislature indubitably has power to vest a large measure of discretionary authority in the agency charged with the administration of a law, enacted in pursuance of the police power, to secure the health and safety of the people. This authority is one of common exercise; it invokes the principle that sustains rate making laws, and the authority vested in examining and control boards created to regulate the professions, trades, businesses, and other callings, deemed by the law-making body to be the proper subjects of governmental supervision. It is only necessary that the statute establish a sufficient basic standard—a definite and certain policy and rule of action for the guidance of the agency created to administer the law."

See, also, *Veix v. Seneca Building & Loan Ass'n,* 126 *N. J. L.* 314, 321 (*E. & A.* 1941). If no standards are set up to guide the administrative agency in the exercise of functions conferred on it by the legislature, the legislation is void as passing beyond the legitimate bounds of delegation of legislative power and as constituting a surrender and abdication to an alien body of a power which the Constitution confers on the Senate and General Assembly alone. Nowhere in this act is there any guide furnished to the board of arbitration other than that it shall arbitrate "any and all disputes then existing between the public utility and the employees," *R. S.* 34:13B–20.

The personnel of the board of arbitration under the statute will vary with each strike. There is no permanence or continuity in the various boards of arbitration which may be constituted in successive cases. There is, thus, an even greater need of specific standards than there would be in the case of a continuous administrative body which might gather experience as it went along. Furthermore, in the absence of standards, the very term "board of arbitration" carries with

it the implication that the board will act in the way that arbitrators customarily act, not according to established criteria but according to the ideas of justice or of expedience of the individual arbitrators. Anyone who has had experience with arbitration realizes that this is the inherent weakness of arbitration as a remedy. Unless standards are set up in any submission to arbitration the tendency to compromise and be guided in part by expediency as distinguished from objective considerations and real right is inevitable. This is especially dangerous in the case of an arbitration where the rights of third parties, here the public, are concerned. Any increase in operating costs which may result from the arbitration will inevitably be charged to the public in increased rates. But the board of arbitration is nowhere directed to consider the rights of the public, which will ultimately be called upon to foot the bill. In these circumstances the need of legislative standards is peculiarly apparent.

Standards of delegation are peculiarly required, moreover, where the legislature is enacting a new pattern of social conduct, *Panama Refining Co. v. Ryan*, 293 *U. S.* 388, 79 *L. Ed.* 446 (1935); *A. L. A. Schechter Poultry Corp. v. United States*, 295 *U. S.* 495, 79 *L. Ed.* 1570 (1935). In *Fahey v. Mallonee*, 332 *U. S.* 245, 91 *L. Ed.* 2030 (1947), the United States Supreme Court held the Home Owners Loan Act constitutional, but in doing so recognized that ampler legislative standards would have been desirable and that the absence of such standards would have rendered the act unconstitutional if the provisions under consideration there had been penal in character. In distinguishing the case from the *Panama Refining Co.* and *Schechter* cases the court said:

"Both cited cases dealt with delegation of a power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom." (332 *U. S. at* 249, 91 *L. Ed. at* 2036.)

The constitutional objection to the lack of definite standards in delegating legislative authority has been anticipated in similar legislation in other states; see *Pennsylvania Laws*

1947 (*S.* 801), *Act* 485, § 11, 20 *L. R. R. Man.* 3062; *Nebraska Laws* 1947, *Bill* 537, *Chapter* 178, § 18, 20 *L. R. R. Man.* 3027; *Wisconsin Laws* 1947, *Chapter* 414, § 111.57, 20 *L. R. R. Man.* 3099; *Florida Laws* 1947, *No.* 297, *Chapter* 23911, § 8, 20 *L. R. R. Man.* 3070; *Indiana Laws* 1947, *House Enrolled Act No.* 392, § 10, 19 *L. R. R. Man.* 3038. The provisions in the act relating to the powers of the board of arbitration are therefore unconstitutional.

The proceedings for compulsory arbitration through the board of arbitration go to the heart of the questioned legislation. Without them it cannot operate. It necessarily follows that the unconstitutional provisions of the statutes are inseparable from those which are otherwise valid. Accordingly, the entire act must be set aside and the judgment below reversed.

HEHER, J., concurred in result.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For affirmance*—None.