Owen L. KERTH, Com'r, Department of Industrial Relations, Commonwealth of Kentucky, et al., Appellants,

v.

HOPKINS COUNTY BOARD OF EDUCATION et al., Appellees.

Court of Appeals of Kentucky.

May 19, 1961.

Rehearing Denied June 23, 1961.

John B. Breckinridge, Atty. Gen., Troy D. Savage, Asst. Atty. Gen., for appellants.

Joseph J. Leary, Frankfort, James F. Gordon, Madisonville, for appellees.

CLAY, Commissioner.

This suit by the Hopkins County Board of Education assails the action of the Prevailing Wage Board (a division of the Department of Industrial Relations) in establishing a prevailing wage schedule for

labor on public works in Hopkins County. The chancellor decided the Wage Board had exceeded its authority and permanently enjoined it from enforcing or undertaking to enforce the prevailing wage rates established by its order of July 5, 1960, or any other schedule. The Wage Board appeals. (It will hereafter be referred to as "Board".)

In 1960 the County Board of Education and the fiscal court of Hopkins County had completed plans for a school building expansion program at the estimated cost of $1,250,000. The voters of that county approved a special tax to finance this project. The Board was requested to establish prevailing rates of wages for the construction work under the provisions of KRS 337.510. This statute requires every "public authority" (which includes the Board of Education) to "ascertain" from the Department of Industrial Relations "the prevailing rates of wages" of laborers, workmen, mechanics, etc., for the class of work called for in the construction of public works in the locality where the work is to be performed. This schedule of wages is required to be attached and made part of the specifications.

On July 5, 1960 the Board adopted a schedule of "Prevailing wages for public works—Hopkins County", listing various trades and hourly labor rates. The record fails to disclose what proceedings produced this schedule. No findings of the Board are recited therein, nor does it appear from whence these figures came nor how they were arrived at.

Thereafter appellees filed this suit, alleging the prevailing wages rates established by the Board were arbitrary, capricious and unlawful. During the pendency of the suit the Board gave notice of and held a hearing on September 12, 1960. Appellees did not appear, but various labor union representatives testified. On that date the Board, by motion, adopted an amended schedule of prevailing wage rates which did not differ materially from those originally established in the schedule of July

5. These wage rates were based substantially upon union rates fixed in labor union contracts applicable to areas other than Hopkins County. The chancellor found as a fact that the overwhelming majority of laborers available for employment on this project in Hopkins County are not covered by collective agreements or understandings between employers and labor organizations in Hopkins County. The correctness of this finding is not questioned on this appeal.

■ Our first question is whether or not the Board may fix local prevailing wage rates based upon labor union contracts or understandings applicable to other localities when an adequate and representative labor force where the work is to be performed is not covered by such agreements or understandings. The answer to this question, as the chancellor decided, must be no.

The only authority of the Board to fix a schedule of prevailing wages based upon union rates is found in the first sentence of KRS 337.520(3), which provides as follows:

> "The board shall establish prevailing wages *at the same rate that prevails or will prevail in the locality* under collective agreements or understandings between bona fide organizations of labor and their employers or associations of employers *if there are such agreements or understandings in the locality applying to a sufficient number of employes to furnish a reasonable basis for considering those rates to be the prevailing rates in the locality."* (Our emphasis.)

It is apparent *this subsection* only authorizes the Board to perform two functions: (1) to determine *if* collective labor agreements or understandings in the locality apply to a sufficient number of employees to. furnish a reasonable basis for considering those rates as prevailing in the locality, and (2) to determine and specify *what* those rates are. Unless the Board makes the first determination, it cannot perform the second

function. The constitutionality of this statute (prior to the 1960 amendment which we will hereafter discuss) was upheld on the ground that the legislature had prescribed this standard as the controlling guide to administrative action. Baughn v. Gorrell & Riley, 311 Ky. 537, 224 S.W. 2d 436.

There is no finding by the Board in its order of July 5, 1960, or its supplemental order of September 12, 1960, that there exists the absolutely essential condition upon which depends its authority to fix a prevailing wage *based upon collective labor contracts or understandings*. No contention is made by appellants that such a finding would have been justified by the evidence heard before the Board (at the September 12 hearing) and the chancellor found as a fact on the proof heard before him that the overwhelming majority of skilled laborers, workmen, mechanics, etc., available for employment in the school building program were *not* covered by collective agreements or understandings in the locality. Under such circumstances the Board could not properly adopt the union rates as the prevailing rates. Carpenters Local No. 1650 v. City of Lexington, Ky., 248 S.W.2d 407.

It is clear from this record that the Board had no "reasonable basis" for determining that union rates were in reality the prevailing rates in Hopkins County. The chancellor therefore properly enjoined the enforcement of the July 5 schedule (and the same conclusion must be reached with respect to the September 12 schedule).

Our second question is whether or not the Board is empowered to fix prevailing wage rates for a particular public works project *in the absence of* collective labor contracts and agreements applying to a sufficient number of laborers in the locality. The chancellor enjoined the Board from enforcing *any* schedule of wages for Hopkins County on this project, it being his conclusion that the Board had no authority to proceed except under the specific conditions prescribed in KRS 337.520(3) which we have just discussed.

The difficulty presented on this question arises from the ambiguities and deficiencies in the pertinent sections of the controlling statutes and the 1960 amendments to KRS 337.510 and 337.520. It is debatable whether or not the 1960 amendments effected a substantial change in legislative policy; but even if they did not, our basic problem is whether the present law adequately implements such policy by granting the Board a legally recognizable authority to fix *all* prevailing wage rates.

Prior to 1960, KRS 337.510 provided that before advertising for bids or entering into a contract for the construction of public works, the "public authority" (that is, the institution authorized to enter into such contracts) should "ascertain" (i. e., establish) the prevailing rates of wages of laborers, workmen, mechanics, etc., in the locality where the work was to be performed. This was a direct mandate to fix all such rates. A schedule thereof was to be attached to and made part of the specifications, printed on the bidding blanks, and made a part of every contract for the construction of public works. It may be noted that the public body which would be a party to the contract was designated by the legislature to represent the public in fixing prevailing wage rates to prevent the exploitation of labor by the contractor. See Cassady v. Board of Aldermen, Ky., 277 S.W.2d 1.

The first sentence of KRS 337.520 formerly provided in general language that wages paid should not be less than the prevailing wages in the same trade or occupation in the locality. (This was apparently a statement of policy and penalties for violation were imposed upon both the public authority and the contractor.)

The next sentence of this section (KRS 337.520) formerly provided that the "public authority" shall establish prevailing wages *based upon collective agreements or understandings applicable to the locality*. This

language, except for naming the public body that shall establish the prevailing wages, is identical with the language carried over into the 1960 amendment, which was the subject of our consideration in answering the first question discussed in this opinion.

It seems to us that under these two statutes (prior to 1960) the public authority was authorized and required to fix *all* prevailing wage rates to be paid under a construction contract to which it was a party. The requirement that wage rates be the same as union rates under prescribed conditions was simply a legislative direction of how to proceed in a special situation rather than a restriction on the general authority granted. At this point we may observe a deficiency in the statute. How should the "public authority" have gone about ascertaining prevailing wages in the locality in the absence of labor contracts? No directions are furnished in the law. It may be observed, however, that the public body authorized to fix the prevailing wages would normally be located in the area where the work was to be done and consequently would have easy access to the sources of information on this subject matter. (There is nothing in the statutes, either before or after 1960, that would seem to require any notice of or hearing in a proceeding to establish prevailing wages.)

While it is urged the amendments of 1960 made no significant changes in the purpose or procedures under these statutes, in fact a radical change was made. The authority to fix prevailing wage rates was shifted from the particular public body interested in the construction contract to an independent board located in Frankfort. KRS 337.520(1). Section (2) of KRS 337.520 added a new provision which required the filing with the Board of all wage contracts between bona fide labor organizations and employers. Instead of the public authority (which proposed to enter into a contract for the construction of public works) being directed *to determine* what were prevailing rates of wages, KRS 337.-510 provides that such body must now *ascertain from the Board* what those prevailing wages are.

The purpose of this significant change in procedure is not at all clear. (Some might think that certain interested parties may have advocated the change in the belief that a three man board in Frankfort would be more favorably inclined to maintain high wage rates than the local authority whose money was to be spent on the project. Or it may be that uniformity was sought, although this would be difficult of attainment because each schedule of rates must be limited to a particular construction contract and must be based upon current local conditions.) In any event, the legislature created a new administrative body with statewide powers.

It may or may not be significant that the new law, *unlike the old, did not specifically direct, require or authorize* the new Board to establish prevailing wage rates generally. Since, however, other language in the statutes required the contracting public authority to "ascertain" from the Board such prevailing wage rates, it may be that the 1960 amendments did not change the legislative policy with respect to the establishment, by some authority, of *all* prevailing wage rates applicable to particular public works contracts.

It is at this point that we run into real difficulty. The legislature created a new and independent agency with very important duties to perform. It very meticulously prescribed standards to guide the Board's exercise of authority when collective bargaining agreements or understandings constituted determinative factors in fixing proper prevailing wage rates. In the absence of these controlling conditions, what other considerations was the Board to take into account?

The law is completely silent with respect to the scope of the Board's authority or duty in the establishment of prevailing wages (when union rates are not applicable). What is a proper "prevailing

wage"? The statute does not even define the term. (It does define a "fair wage" and specifically sets forth the controlling considerations in the fixing of a "minimum fair wage" by another wage board. KRS 337.010 (3) (a) and 337.230.) It does not identify a single factor the Board shall take into consideration. There is simply nothing in this legislation which offers any clue to what the legislature intended should guide and control the Board's determination of proper "prevailing wage" rates. Not only is the Board left completely adrift with respect to how it should go about establishing proper prevailing wages for a particular contract, but no one, including this court, is furnished any criteria by which to determine whether the Board is carrying out the assumed legislative policy as the legislature intended or whether a particular action of the Board properly protects or actually impairs the legal rights of interested parties. The Board itself has a legitimate complaint that it is saddled with the undefined duty of charting all the rules.

The problem presented arises most often when a statute is challenged as unconstitutional because of the failure of the legislature to furnish adequate standards to guide an administrative agency in the performance of it functions. No constitutional issue is here raised and such an approach is unnecessary. The question is not whether the legislature illegally delegated its powers but whether it failed to delegate any power in this respect by failing to prescribe the manner of its exercise. In other words, we have no more than a general indication of legislative policy without implementation which would enable the administrative agency to function according to law.

■ This deficiency falls within the scope of the rule that where the intention of the legislature is so obscure as to defy a rational meaning, the law cannot be given effect. As stated in Folks v. Barren County, 313 Ky. 515, 232 S.W.2d 1010, 1013:

"* * * where the law-making body, in framing the law, has not expressed its intent intelligibly, or in language that the people upon whom it is designed to operate or whom it affects can understand, or from which the courts can deduce the legislative will, the statute will be declared to be inoperative and void. * * *"

See also Burke v. Stephenson, Ky., 305 S.W.2d 926; Opinion by The Justices, 249 Ala. 88, 30 So.2d 14.

■ With respect to administrative agencies, it is fundamental that the legislature must prescribe some standard governing the scope of administrative action. Otherwise the law is invalid because it reposes in the agency an absolute, unregulated and undefined discretion. 42 Am.Jur., Public Administrative Law, Section 45 (page 342).

One of the most famous cases which involved substantially the problem before us was A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. Therein the Supreme Court of the United States struck down a section of the National Industrial Recovery Act, 48 Stat. 195, because it vested in the President the enforcement of broad legislative policies but failed to provide standards to govern the exercise of discretion by the executive. Among other things the Court called attention to the fact that while the term "fair competition" was used to express a legislative policy, the act failed to define this term. A similar fault may be found in the legislation before us when the legislature used the term "prevailing wage" but failed to define it or to specify what considerations should control its determination.

A similar case is Panama Refining Co. v. Ryan, 293 U.S. 388, 430, 55 S.Ct. 241, 252, 79 L.Ed. 446, wherein the Supreme Court held invalid another section of the National Industrial Recovery Act (relating to the transportation of petroleum products), the Court saying:

"As to the transportation of oil production in excess of state permission,

the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited."

In State, by Van Riper v. Traffic Telephone Workers' Federation, 2 N.J. 335, 66 A.2d 616, 9 A.L.R.2d 854, the New Jersey Supreme Court invalidated an act designed to prevent work stoppages because the administrative agency authorized to "arbitrate" labor disputes was furnished no guide for the carrying out of its duties.

In State v. Stoddard, 126 Conn. 623, 13 A.2d 586, the court considered a Connecticut statute which authorized an administrator to establish a "minimum price" for milk areas. The court stated (at page 588 of 13 A.2d):

> "In order to render admissible such delegation of legislative power, however, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits, and enjoin a procedure under which, by appeal or otherwise, both public interests and private rights shall have due consideration."

See also Thompson v. Smith, 155 Va. 367, 154 S.E. 579, 71 A.L.R. 604; Goldman v. Crowther, 147 Md. 282, 128 A. 50, 38 A.L.R. 1455; and Boshuizen v. Thompson & Taylor Co., 360 Ill. 160, 195 N.E. 625.

■ In the foregoing cases the laws in question were declared invalid on the constitutional ground that there was an unlawful delegation of legislative power. We do not quite reach that point in the present case because it is not clear that the legislature intended to delegate to the Board an unrestricted discretion to fix prevailing wage rates when collective labor agreements or understandings did not furnish a usable yardstick. However the result is the same. Whether or not the legislature intended to delegate to the Board authority to fix *all* prevailing wage rates for public works, it fell short of this purpose when it failed to provide necessary guiding standards to create such an operative law.

The same result is reached if we apply the rule that when certain powers are given to be performed in a specified manner, there is an implied restriction upon the exercise of those powers in excess of the grant. Johnson v. Correll, Ky., 332 S.W. 2d 843. Here the legislature did prescribe a method of fixing prevailing wages under specified conditions. As the chancellor decided, this statutory measure is the source and limit of the Board's authority.

In our opinion the Board is without authority to fix prevailing wage rates except under the prescribed conditions of KRS 337.520(3). (discussed in the first part of this opinion) and it was properly enjoined from enforcing or undertaking to enforce any wage schedule for Hopkins County with respect to the public works project here involved.

The judgment is affirmed.

MILLIKEN, MOREMEN and PALMORE, JJ., dissenting in part.

PALMORE, Judge (dissenting in part).

I dissent from that phase of the opinion holding that the Board cannot go outside and beyond the coverage of existing collective agreements in order to determine "prevailing wages" in a given community because the statutes do not lay down precise criteria to be followed in performing that function.

In City of Louisville v. Thompson, Ky. 1960, 339 S.W.2d 869, 873, involving the "hot bath" ordinances of the City of Louisville, we had no difficulty in accepting the

existence of a "hardship" as "reasonably adaptable to proof and findings of fact capable of judicial review" without more specific criteria. See also Thomson v. Tafel, 1949, 309 Ky. 753, 218 S.W.2d 977. It appears to me that "prevailing wages" for each classification of labor forces available in a particular locality are equally, if not more, susceptible of determination without further definition. In the absence of a statutory mode of review, an arbitrary determination should be reviewable through an original action in the circuit court, and was so treated in this case. Cf. 73 C.J.S. Public Administrative Bodies and Procedure § 164, pp. 506–507. See also Davis, Administrative Law Treatise, Vol. 4, § 28.21, pp. 112–113.

The majority opinion tacitly recognizes that such a determination could properly be made by the local authority prior to the 1960 legislation transferring the function to the state Board. How are the "factors" and "standards" to be used by the Board any different? The answer is, of course, that they are not; and they were specifically held to be sufficient in Baughn v. Gorrell & Riley, 1949, 311 Ky. 537, 224 S.W.2d 436, 439.

I take it that the fundamental objective of the "prevailing wage" statutes is to make certain that no contractor on a public project will import labor at lower rates than are commonly paid in the community. Cf. Cassady v. Board of Aldermen of City of Bowling Green, Ky. 1955, 277 S.W.2d 1. While it might be easier for the local authorities to find out what those rates are, there is nothing so complex about the question that some other public agency could not also do it. Certainly the criteria, the standards, the guidelines, or whatever else we might call the factors for determining what wages "prevail" must be the same in either case. According to Carpenters Local No. 1650 v. City of Lexington, Ky. 1952, 248 S.W.2d 407, "prevailing" means a majority. There is nothing more mysterious about ascertaining a majority than there is in taking a census.

My dissent in this case does not proceed from any particular attitude as to either the wisdom or the haphazard draftsmanship of the statutes in question, but from the philosophy that the courts should always construe the actions of the legislature in such a way as to uphold them if it is reasonably possible to do so.

MILLIKEN and MOREMEN, JJ., concur in this dissent.