THE PEOPLE OF PUERTO RICO, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, PABLO JUAN Y TORO, JUDGE, Respondent.

No. 2373. Submitted May 19, 1958.—Decided May 12, 1960.

*Hiram R. Cancio, Secretary of Justice (J. B. Fernández Badillo, former Secretary of Justice, Arturo Estrella, Assistant Attorney General,* and *Alfredo Archilla Guenard, Fiscal of the Supreme Court,* on the brief) for The People.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

We issued a writ of certiorari in this case to review an order of the Superior Court, San Juan Part, which holds that § 15 of Act No. 279 of 1946 (Sess. Laws, p. 598), known as The Automobile and Traffic Act (9 L.P.R.A. § 185), as amended by Act No. 156 of April 26, 1951 (Sess. Laws, p. 368), does not authorize the Commissioner of the Interior, now Secretary of Public Works, to fix speed limits on the roads of the rural zone of Puerto Rico.

The controversy was originated in the District Court, San Juan Part, as a result of several drivers having been prosecuted for alleged violations of the speed limits fixed by the Secretary of Public Works in different places of Highway No. 1 and the 65th Infantry Avenue. The defendants filed demurrers to the information alleging that the Secretary lacked legal authority to regulate the speed in the rural zone and to fix speed limits higher than those stipulated by the Act. For such reasons they urged to be acquitted from the offense charged. The People appealed to the Superior Court by way of certiorari from an order decreeing the dismissal of the complaints. After the appeal was heard with the intervention of the parties and the respondent judge,[1] the Superior Court affirmed the orders of the trial court.

## I

Before deciding the case on the merits we must first pass on a jurisdictional question.[2] Did the Superior Court have power to review by certiorari the decision of the District Court dismissing the complaints? It is obvious that if the Superior Court did not have that power, this Court does not have it either to review the actions of said court. We begin the analysis with three basic principles.

First, it is clear that the judgment rendered by the District Court constituted a final disposition of the case and that the nature of the issue barred the trial judge from ordering the filing of another complaint for the same offense. Sections 150 to 158 of the Code of Criminal Procedure (34

---

[1] We take the opportunity of this judgment to state our disapproval of the practice, quite widespread in recent years, of the respondent judges to appear personally or through counsel to defend their orders before the courts of appeal. Those interventions should be made by the parties actually affected by the decision and not by the judge. Only truly extraordinary circumstances would justify the magistrate's appearance.

[2] The defendants have failed to appear before this Court, but the jurisdictional question was raised before the Superior Court, which left it undecided.

L.P.R.A. § § 361–69) ; *García* v. *District Court*, 68 P.R.R. 20 (1948).

Second, our legislation does not authorize and has never authorized the use of appeal by The People to review in the Superior Court judgments of acquittal entered by the District Court.[3] Section 2 of the Act of May 28, 1904 (Sp. Sess. Laws, p. 11) (34 L.P.R.A. § 80) ; § 19 of the Judiciary Act (4 L.P.R.A. § 122), Rule 9 of the Rules for Appeals to the Superior Court (4 L.P.R.A. p. 965).

Third, under the circumstances of the present case such appeal or any other remedy, if authorized by the Act, does not encroach in any way upon the constitutional rights of the defendant and particularly his privilege of not being put twice in jeopardy for the same offense. *Bassing* v. *Cady*, 208 U.S. 386, 391 (1908) ; *Collins* v. *Loisel*, 262 U.S. 426, 429 (1923) ; *Wade* v. *Hunter*, 336 U.S. 684, 688 (1949) ; *Cf. García* v. *District Court, supra.*

The problem having been thus structured, the question is reduced to deciding whether under our certiorari Act and the standards set up around it here, the issuance of the writ by the Superior Court in the present controversy is proper. It is indispensable, of course, that in delving into this problem we weigh the effects of our decision on the administration of criminal justice and on the Puerto Rican judicial organization.

The applicable Act reads:

"The writ of certiorari is a writ issued by a superior to an inferior court requiring the latter to send to former a certified copy of some proceeding therein pending, or the record and proceedings in some cause already terminated in cases where procedure is not according to the course of the law, and to

---

[3] Section 19 of the Judiciary Act establishes "the right of appeal from any final judgment of the District Court to the Superior Court." Although those words, as may be noted, do not expressly prohibit the appeal by The People, we are convinced, in the light of the historical development of our legislation, that the Act did not intend to authorize that appeal.

complete the proceedings when the lower court refuses to do so upon erroneous grounds." (32 L.P.R.A. § 3491.)

The mere reading of this provision satisfies us that the case in question squarely falls within its ambit. The Superior Court and the District Court are obviously embraced by its terms and our aim is to determine whether the trial court has acted "according to the course of the law." *Cf. Pérez* v. *District Court*, 69 P.R.R. 4, 14 (1948). It is also elementary and does not require citations of authorities, that one of the grounds for issuing the writ is the nonexistence of an adequate remedy properly protecting petitioner's rights. Consequently, we would have to find in factors extrinsic to the Act the reasons for denying the certiorari under the present circumstances.

Those reasons are, in the first place, of historical origin, generally applicable to the United States and in particular to Puerto Rico. *United States* v. *Sanges*, 144 U.S. 310 (1892) is probably the best expression of such reasons. The United States urged the Federal Supreme Court to issue a writ of error to review a decision of the Circuit Court decreeing the quashing of an indictment. There arose the problem of whether the Court had jurisdiction over the case under the provisions of an Act permitting the use of those writs "in any case that involves the construction or application of the Constitution of the United States." Act of March 3, 1891, 26 Stat. 827, 828. At the beginning of the analysis Mr. Justice Gray said: "This statute, like all acts of Congress, and even the Constitution itself, is to be read in the light of the common law, from which our system of jurisprudence is derived." (At 311.) Based thereon, the Court concluded that the law of England, although "not wholly free from doubt" on this matter, permitted only the defendant to have either a new trial or a writ of error in a criminal case and that it was settled by the overwhelming weight of American authorities that under the common law the state had no right to sue out a writ of error upon a judgment in

favor of the defendant, except under and in accordance with express statutes. However, the Court accepted that in four states—North Carolina, Maryland, Louisiana and Pennsylvania—the government had been allowed to bring the appeal or writ of error to review a judgment for the defendant on a demurrer to the indictment, motion of special verdict or a motion in arrest of judgment. He attributed those decisions to the fact that "the question appears to have become settled by early practice before it was contested." (At 316.)

The opinion in *Sanges* has marked deficiencies. In the first place it has been proven conclusively that in England the old common law permitted the Crown to use a varied number of writs, among them the writ of error and certiorari to review judgments in favor of the defendants. The American courts which based on English common law refused to recognize the right of the state to use such writs had a very weak foundation. Kronenberg, *Right of a State to Appeal in Criminal Cases*, 49 J. Crim. L., C. & P.S. 473 (1959); Moreland, Modern Criminal Procedure, 273 (1959); Johnson, *The Right of the State to Sue Out a Writ of Error in Criminal Cases*, 11 Chi.-Kent L. Rev. 85, 86–91 (1932); Harris, The Law of Certiorari, 5 (1893). Second, "the supreme courts of twelve states, . . . have held that the state has a right to sue out a writ of error as a matter of prerogative under the constitutions of those states; that such right should vest in the state under the constitution unless it is expressly withheld; and that the correct interpretation of the common law meaning of a writ of error is a writ of error sued out by either a convicted defendant or the state." Johnson, *op. cit.* at 99. None of those twelve states had a statute or constitutional provision expressly authorizing the government to obtain writs of error in criminal cases.[4] Third, it

---

[4] A synopsis of the state statutes relative to appeals by the state in criminal cases is found in The American Law Institute, Code of Criminal Procedure, 1203–11 (1931); Kronenberg, *op. cit.* at 476–79. See, also, Miller, *Appeals by the State in Criminal Cases*, 36 Yale L. J. 486 (1927).

is incorrect that the early practice was conclusive in all those states. Several of the opinions considered the case on the merits and authorized the use of the writ by the state after a thorough examination of the problem. Thus, for example, the Supreme Court of Maryland, in what is said to be the first opinion rendered in the United States on the subject—Johnson, *op. cit.* at 91—after analyzing the historical circumstances, stated:

"And there is no sufficient reason why the State should not be entitled to a writ of error in a criminal case. It is perhaps a right that should be seldom exercised, and never for the purpose of oppression, or without necessity; which can rarely, and it is supposed would never happen, and would not be tolerated by public feeling. But as the State has no interest in the punishment of an offender, except for the purpose of general justice connected with the public welfare, no such abuse is to be apprehended; and as the power of revision is calculated to produce a uniformity of decision, it is right and proper that the writ should lie for the State, in the same proportion as it is essential to the due administration of justice that the criminal law . . . be certain and known, as well for the government of Courts and information to the people, as for a guide to juries . . ." *State* v. *Buchanan,* 5 Harr. & J. 317 (1804) cited in Johnson, *op. cit.* at 92. See, also, other cases described in said article.

However, and irrespective of those marked deficiencies of the opinion in *United States* v. *Sanges*, the real important thing is that that decision and the state precedents supporting it can not apply to our case because the doctrine of strict construction of statutes derogating the common law—quite discredited nowadays in the United States—[5] can not operate in a jurisdiction where the common law does not and has never existed. In other words, we can not use *Sanges* and other similar state decisions to limit the natural and logical meaning of the terms of our certiorari Act because the re-

---

[5] Fordham and Leach, *Interpretation of Statutes in Derogation of the Common Law*, 3 Vand. L. Rev. 438 (1950); Hall, *Strict or Liberal Construction of Penal Statutes*, 48 Harv. L. Rev. 748 (1935).

strictions arising therefrom rely solely on a historical juridical course that is neither ours nor ours to adopt.

Therefore, we must find the elements of judgment in the historical development of our pertinent provisions. We know that in Puerto Rico the state can not use an appeal to review a judgment of acquittal from the District Court to the Superior Court and that our lawmakers, in adopting the criminal procedure of California, eliminated the provisions [6] that would have authorized such appeal. On the other hand, we know the elementary principle that certiorari, as well as other extraordinary remedies, lies precisely when no appeal or other ordinary remedy exists protecting the petitioner's rights effectively and rapidly.[7] Furthermore, we know that the decisions of this Court relative to certiorari have been prompted by the desire to offer a speedy and effective remedy, in the criminal as well as civil spheres, in cases where justice or an important social interest is in danger because of deficiencies in the ordinary procedural remedies. Some examples taken from our prolific case law [8] dealing with certiorari are sufficient to mark the attitude we have taken in the past. In cases of unlawful detainer and claims not exceeding $300, although the applicable law provided expressly that there would be a single appeal, yet we have issued the writ on numerous occasions to review the actions of the lower court.[9] We have also authorized certiorari in cases where although the remedy of appeal exists it is inadequate and even, in extraordinary circumstances, where being ef-

---

[6] Section 1466 of the Penal Code, 51 West's Annotated California Codes 58.

[7] "The fact that an order, decision or judgment is unappealable by operation of law, although in itself does not warrant the issuance of certiorari, contributes effectively to move judicial discretion when there is an error of procedure or an excess of jurisdiction." *Toledo Alamo, El Certiorari Clásico en Puerto Rico*, 16 Rev. Jur. U.P.R. 315, 354 (1947).

[8] That case law is skillfully arranged and discussed in the said Toledo Alamo article, but unfortunately it only covers the situation up to 1947.

[9] *Toledo Alamo, op. cit.*, at 352–55.

fective, the petitioner has allowed the jurisdictional term to elapse.[10] Identical view has been taken in cases of interlocutory orders which were reviewable in the main appeal.[11] In *Bull Insular Line* v. *Super Ct.; Conrad, Int.*, 79 P.R.R. 217 (1956) after deciding that under the Judiciary Act in force the Superior Court has power to issue writs against the District Court,[12] it was held that if after a writ of certiorari was issued, the ordinary appeal was perfected in the same suit, the question could still be decided by the extraordinary remedy, if the latter was more adequate than the appeal.

In the criminal sphere we have authorized the use of certiorari on numerous occasions, at the instance of the defendant as well as of The People, when the remedy of appeal did not exist. The following are examples of the first: *Alcalá* v. *District Court*, 66 P.R.R. 409 (1946); *Méndez Bas* v. *District Court*, 44 P.R.R. 520 (1933); *Fontaine* v. *District Court*, 57 P.R.R. 136 (1940; *Segarra* v. *District Court*, 61 P.R.R. 196 (1942); *Germán* v. *District Court*, 63 P.R.R. 587 (1944); *López* v. *Superior Court*, 79 P.R.R. 470 (1956); and *Rodríguez* v. *District Court*, 60 P.R.R. 894 (1942). In this last decision we stated that certiorari lay "considering that the question sought to be reviewed is at once procedural and jurisdictional . . . and that no appeal can be taken from the orders complained of . . . ." (At 896.)

We have followed the same course when The People has been the petitioner.[13] In *People* v. *District Court*, 44 P.R.R.

---

[10] *Id.* at 349–51.

[11] *Id.* at 356.

[12] Rule 55 of the Rules of Civil Procedure in force provides that "The Supreme Court and the Superior Court shall issue writs of certiorari, of prohibition and quo warranto in the same manner as those issued heretofore."

[13] In *People* v. *District Court*, 40 P.R.R. 826 (1930) the Court stated that: "While this application is made in a criminal case the general principles of certiorari are applicable to it." At 827. In *People* v. *District*

681 (1933) the District Court did not adjudge the subsequent offense nor imposed the penalty provided by law. Although this Court finally set aside the writ that had been issued at the request of the District Attorney, it did so solely because the defendant had already served the sentence. As to whether the appeal lies it was said in the opinion: "However, since the question of form is interlaced with that of substance, this Court might—*especially in view of the fact that the remedy by appeal is not available*—not only direct the court below to enter a specific finding, but also to do so in accordance with the principles laid down in this opinion . . . ." (At 690, italics ours.) In *People* v. *District Court*, 66 P.R.R. 379 (1946) at the request of The People an order of the former District Court suspending the sentence in a misdemeanor case was set aside by certiorari. In *People* v. *District Court and Colón, Int.*, 74 P.R.R. 783 (1953) also at the request of The People we set aside by certiorari an order of the former District Court decreeing the dismissal of one of the counts of the information. The same issue involved herein was raised before this Court, supported by the same arguments.[14] Upon rejecting that contention we said:

"Considering the provisions of § 670 of the Code of Civil Procedure, defining and authorizing the writ of certiorari and in view of its scope and broad sphere of action recognized by our decisions, we shall not adopt the doctrine invoked by the intervener. To hold otherwise would amount to an unwarranted limitation and restriction of the function and use of that

---

*Court,* 60 P.R.R. 217 (1942) we issued the writ and set aside several orders entered for the defendant even where The People could appeal from the order involved herein.

[14] "He also contends that § 348 of the Code of Criminal Procedure enumerates the cases when the People of Puerto Rico may appeal from 'a judgment of acquittal rendered by a lower court, and that the case at bar is not covered by any of its subdivisions,' and that an order like the one at bar not being reviewable by an appeal, neither can it be reviewed by certiorari, and it must be presumed that the legislative intent was not to authorize review by way of certiorari." (At 789–90.)

relief, and to a waiver of power which, in the exercise of our discretion, we have always had to review orders and decrees entered in criminal cases, either at the request of the defendant or at the instance of the People, *where, as a general rule, no appeal can be taken therefrom, and in our judgment the circumstances so warrant.*" (At 790. Italics ours.)

In *People* v. *Super. Court; Somohano, Int.,* 79 P.R.R. 719 (1956) we set aside, by certiorari issued at the request of the People, an order granting a demurrer against the information for lack of facts to constitute a public offense, and in *People* v. *Super. Court; Figueroa, Int.,* 81 P.R.R. 446 (1959) an order decreeing the dismissal of a case under § 448(1) of the Code of Criminal Procedure.[15]

Briefly, we have not been able to find nor has a single judgment of this Court been cited where we have refused to issue a writ of certiorari for the sole reason that the statute does not authorize an appeal in those circumstances. On the contrary, on numerous occasions, in the civil as well as in the criminal spheres, we have granted the remedy where the statute has denied the appeal expressly or impliedly.[16]

---

[15] See also *People* v. *Super. Court; Ramos Int.,* 80 P.R.R. 679 (1958) where at the request of the Commonwealth we reviewed by certiorari an order of the Superior Court directing the district attorney to deliver to the defendant copy of the latter's statement made in the preliminary investigation.

[16] We have found only one judgment of this Court, *People* v. *Municipal Court,* 46 P.R.R. 610 (1934), where the question at bar was raised. We denied the writ because of "unnecessary delay" by the People and stated, without analyzing the problem, that "we rather think that mandamus would have been the appropriate writ to compel the court to take jurisdiction." (At 613.) That expression must be considered as overruled in the light of what we are deciding today. The Supreme Court of the State of Washington has decided in circumstances practically identical to those of the present case that certiorari lies. *State ex rel. Brown* v. *Brinker,* 194 Pac. 574 (1921); *State* v. *Rear,* 105 P.2d 827, 828 (1940). *Cf. State* v. *Muolo,* 172 Atl. 875 (Conn. 1934); *State* v. *Coleman,* 190 Atl. 791 (R.I. 1937); *Right of State to writ of certiorari in criminal case,* 109 A.L.R. 793 (1937); *Right of prosecution to review of decisions quashing or dismissing indictment or information, or sustaining demurrer thereto,* 92 A.L.R. 1137 (1934).

It is alleged, however, that in the criminal field said decisions are inapplicable to the present conflict because the case involves writs issued by the Supreme Court by virtue of an "inherent" power to review and as part of its duty, as a court of last resort, "to watch for the proper furtherance of justice for the defendant as well as for the Commonwealth and to establish uniform standards in the administration of criminal justice." Aside from whether or not that "inherent" power exists, the truth is that: (1) this Court has never used that argument to warrant its intervention by certiorari; (2) neither the certiorari Act nor the interpretative decisions lend support to the theory that the powers of this Court, within the ambit of that remedy, are greater with respect to the Superior Court than those of the latter with respect to the District Court; (3) the power of the Superior Court in this case need not be sought in a "general revisory or appellate jurisdiction" but rather in the certiorari Act from which it clearly flows; (4) if we accept the argument proposed to us, we would have to decide that it is incumbent on this Court to review directly by certiorari the District Court in this and other similar cases, a proposition which aside from its doubtful juridical validity is full of practical difficulties and is in open conflict with the system of judicial hierarchy sanctioned by the Constitution and the laws of our country. *Toledo Alamo, op. cit.* at 373–75. The real reason why this Court has issued the writ for the State on several occasions does not stem from an "inherent" power of supervision, but from the enlightening words pronounced by Mr. Justice Sifre as the unanimous view in *People* v. *District Court and Colón, Int., supra.*

". . . It has been our policy to use our power for the protection of all parties. It would be highly unfair to deny it to the State when, in order to comply with its duty to enforce penal laws, it demands said protection which can only be obtained by way of certiorari, and this remedy may be granted to afford such a protection, without impairing or destroying substantial rights

of the defendant, which rights necessarily prevail over the relief sought by the People to review incidents or actions originating in prosecutions of a criminal nature." (At 792.)

There is no good reason for denying to the Superior Court the exercise of that power, subject, naturally, to our revisory authority.

The consequences could really be disastrous for our system of criminal justice if we deny to the State the opportunity it now seeks. That denial would make the district judges final arbiters of all legal and constitutional questions of law raised before them whenever their decision were adverse to the State. That would mean that in practically all misdemeanors comprised in the Penal Code and in a countless number of special laws such as the one under our present consideration, those judges would be entirely free to decide against the People as to the legal contents of those provisions and the validity of the constitutional and legal defenses that could be presented by the defendants. Aside from the opportunities for arbitrariness, corruption and favoritism that such situation would produce, fortunately minimal in our system because of the integrity of our magistrates, there would inevitably arise a great variety in the decisions when about sixty judges of identical hierarchical position expressed their views on those matters. Under those circumstances and until the same questions be raised on appeal by the defendants, our constitutional power as the "court of last resort," would flounder, as well as the efforts of the investigatory and accusatory officers to obtain a uniform application of the penal statute and the elementary right of the community to know the substantive and procedural penal restrictions imposed on them by their government. We are convinced that no reasonable lawmaker, whether in 1902, 1904, 1952 or 1960 would want such a chaotic condition for the judicial system of his country.[16a]

---

[16a] It is true that the discipline of the judges and their obedience to the law are not prompted primarily by fear of reversal, but rather by

Neither should we fear an extensive use of such remedy by the People, to the extent of overcrowding the Superior Courts with that type of controversy. Experience, both in the United States [17] and Puerto Rico,[18] shows that the state sparingly uses its opportunities to obtain review of decisions or orders rendered in criminal cases. Besides, it is a fact that in the District Court the great majority of criminal cases are heard in the absence of public or private prosecuting attorneys. Consequently, certiorari at the request of the People will be used on very few occasions.

In view of the foregoing, we decide that the Superior Court was authorized to issue the writ of certiorari in this case,[19] just as this Court is to review that action by the same means. *Borinquen Furniture* v. *District Court; Umpierre, Int.*, 78 P. R. R. 858 (1956).

## II

 The Superior Court decided, as to the merits of the case, that § 15 of said Act No. 279 of 1946, as amended [20]

---

their professional and personal integrity, by the vigilance of citizenship and their brothers of the bench and bar, and in last resort by the traditions of respect for the law that may exist in the community. But no system of justice could survive in a world as complex as the present one if there did not exist at the top of the organization an authoritative voice fixing in a final and uniform manner the meaning of the law.

[17] Kronenberg, *op. cit.* at 480.

[18] Information furnished by the office of the secretary of this Court shows that in the calendar year 1958–59 133 criminal appeals were filed, of which only one was submitted by the People.

[19] It is entirely unnecessary to enumerate here the other cases where the appeal to the Superior Court at the request of the People would lie. It suffices to mention that the general principles regulating certiorari and the more specific standards that we have adopted concerning it would be applicable, particularly the one prohibiting the issuance of the writ where it would tend to impair or destroy the substantial rights of the defendant.

[20] "Section 15.—(a) The speed of a motor vehicle shall at all times be regulated with due care, and with due regard to the width, amount of traffic, use, and condition of the highway. No person shall drive at a speed higher than that which may permit him to exercise due control

in 1951, does not authorize the present Secretary of Public Works to fix speed limits in the rural roads of Puerto Rico.

The trial court determined that the power of the Secretary "to fix speed limits in Puerto Rico cannot be exercised in any way with respect to the roads of the rural zone, since only in accordance with § 15 (b) of the aforementioned Act, the authority of the Secretary of Public Works to fix speed limits *has been recognized exclusively to regulate the speed of motor vehicles in the circumstances specifically enumerated in the aforesaid legal provision*, inasmuch as the above-cited § 15 (a) of the Automobile Act of Puerto Rico is the one regulating all such cases, as to speed, that have not been expressly enumerated in that same § 15 (b) of the Act in question, in relation to § 17 (o) of Act No. 279 of 1946 as subsequently amended." [21] (Italics of the trial judge.) In sup-

of the vehicle and to reduce the speed, or to stop when necessary in order to avoid knocking down a person or to collide with any other vehicle or transportation device on the road or entering same, in compliance with the requirements of law and with the duty of exercising the due care to which drivers and other persons using the road are subject.

"(b) It shall be unlawful to operate a motor vehicle at a speed of more than twenty-five (25) miles an hour in the urban zone; or at a speed of more han fifteen (15) miles an hour in rounding a curve where the view is not clear at a distance of one hundred (100) meters towards the front; or in crossing an intersection at a speed of more than fifteen (15) miles an hour when the driver of the vehicle cannot clearly see the vehicles approaching or which may approach said intersection within a limit of fifty (50) meters in all directions, save in such intersections where traffic is regulated by traffic lights, in which case the driver having the right to continue may do so at the speed fixed for the urban zone; or at a speed of more than fifteen (15) miles an hour when passing a district where public schools are located. The Commissioner of the Interior is hereby authorized to establish zones and fix speed limits therefor within the limits fixed in this Act; and when doing so he shall fix signs and notices indicating the maximum speed.

"Any person violating any of the provisions of this section shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not less than twenty-five (25) dollars nor more than two thousand (2,000) dollars, or by imprisonment in jail for a term of not less than five (5) days nor more than two (2) years, or by both penalties, in the discretion of the court."

[21] "(o) The Commissioner is hereby authorized to prescribe additional rules regulating traffic on the public highways, provided they are not

port of this determination it cites well-known principles of strict construction of criminal statutes and of displacement of the administrative regulation by that of the Act.

Let us examine first the letter of the law. "The Commissioner of the Interior [Secretary of Public Works] is hereby authorized to establish zones and fix speed limits therefor within the limits fixed in this Act; and when doing so he shall fix signs and notices indicating the maximum speed." This provision contains two limitations to the authority of the Secretary. One binds him not to increase the speed limits fixed by the Act for certain occasions and the other to fix signs and notices indicating the maximum speed. However, in the part pertinent to this case, the lawmaker granted full authority to the Secretary to "establish zones." The trial court determined that that authority must be limited "in the circumstances specifically enumerated" in the sentence preceding the one in question. That sentence mentions two "zones", urban and the one "where public schools are located." [22] It is clearly illogical to assume that a general delegation to "establish zones" has been limited by the Act authorizing it to the two "zones" established by that same Act, in other words, it is unthinkable that the legislative on the one hand granted the Secretary authority to "establish zones" and on the other, deprived him of that power by expressly establishing itself the only possible "zones."

Another interpretation, however, is suggested to us, by which the Secretary would have the authority to fix speed limits in rural zones but within the limits established in the Act, regarding them separately from the circumstances to which the Act applies them. We must reject it because: First, it requires a work of surgery in the Act—to separate

---

incompatible with the provisions of this Act. Said rules, when promulgated, shall have the force of law."

[22] It also mentions curves and intersections of the streets although not labelled "zones." Whether or not they be considered "zones", the conclusion as to the powers of the Secretary must be the same.

the speed limits from the occasions to which they apply—for which no authorization is shown nor actually exists. Thus, for example, when the Secretary wishes to fix speed limits on a definitely *rural* road or highway, he could not, according to this interpretation, fix more than 25 miles per hour, although that limit by express provision of the Act is for the *urban* zone. Second, if the said separation is not made, it leads, although more indirectly, to the same result of precluding the Secretary from using the authority to "establish zones" expressly granted to him by the Act. If the delegation, as claimed, is to permit the Secretary to regulate the speed in those places where the *rural* zone has the characteristics of an *urban* zone, the delegation to "establish zones" is entirely superfluous, because the Act already expressly establishes that type of zones and then it would have only been necessary to authorize the Secretary to reduce the speed limits in the zones provided by the Act. Third, it leads us as we shall see hereinafter, to the same results, thwarting the legislative purpose, as the interpretation of the trial judge.

We are convinced, on the contrary, that the only logical interpretation of the legislative plan, and what the legal provision says, is that the Secretary has a general power to establish zones and a restricted power to fix speed limits, the latter subject to the limits established by the Act *for certain specific occasions* and to the requirement to fix notices. That such was the legislative intent is clearly revealed by an analysis of the traffic legislation approved as of 1940 [23] and of the legislative history of the provision at bar.

Act No. 279 of 1946, as amended, constitutes the last legislative attempt to provide our country with efficient and modern regulations for traffic and the use of motor vehicles.

---

[23] An Act of March 14, 1907 (Sess. Laws, p. 368) fixed specific speed limits for motor vehicles for the first time. Act No. 75 of April 13, 1916 (Sess. Laws, p. 140) repealed the 1907 Act, established a basic rule of "reasonable precaution" and general speed limits for specific occasions.

The efforts in such direction date back to 1884 when the "Rules and Regulations for the Protection and Policing of the Insular Highways of Puerto Rico," approved by the Spanish Government went into effect. As of that date there have been continuous changes in the statutory and regulatory provisions [24] in order to reconcile legislation with the technological changes of the industry and its social and economic effects on the community.

Act No. 140 of May 6, 1940 (Sess. Laws, p. 782) repealed all the preceding Acts and created a uniform system of regulations. In its § 6 it established the "speed restrictions" starting from a "basic rule" which imposed on every driver the duty to be "reasonable and prudent" and to exercise "due control of the vehicle." Subsequently it fixed speed restrictions from 15 up to 45 miles covering different situations in the urban as well as in the rural zones. Thereafter (§ 21) it granted power to the local authorities to permit, by ordinance and in specific places, higher speeds than those stated in the Act, provided neither the basic rule nor the maximum limit of 45 miles per hour were changed. As to this aspect, the former Commissioner of the Interior was only granted authority to conduct investigations of bridges, viaducts and breakwaters and to determine the maximum speed which such structures could withstand, informing the public of his determinations by notices placed at the end of such structures.

Act No. 55 of April 27, 1942 (Sess. Laws, p. 526) repealed the 1940 Act and established a new system of traffic regulation. It kept (§ 11) the responsibility of driving "at all times" with "due care" but changed the specific speed limits, fixing a maximum of 48 kilometers an hour on public roads [25] and 24 in urban zones. It also fixed limits for other

---

[24] The complete list of the Acts approved from the beginning of this century is found in 9 L.P.R.A. § 171.

[25] The first section of the Act defined "public road" as "any insular or municipal road or any street or alley of any municipality."

758

specific cases (curves and heavy vehicles).[26] Finally, subdivision (e) of the said section modified the authority of the Commissioner authorizing him to make "additional rules regulating traffic on insular roads, not inconsistent with the provisions of this Act." The Act grants no permission whatever to local authorities to fix speed limits.

In 1946 the Legislature again created a new system of traffic regulation upon enacting Act No. 279 and repealing the 1942 Act. Section 15(a) preserves the basic rule of "due care" but establishes the following new speed limits: 25 miles an hour in the urban district, 15 in the curves and intersections where the view is not clear or when passing a public school and 45 miles in all other cases. It subsequently adds that "the Commissioner of the Interior is hereby authorized to establish zones on public highways and to fix speed limits therefor." Section 17(o) repeated the Commissioner's authority to prescribe additional rules not incompatible with the Act, regulating traffic, but extended his jurisdiction to cover the "public highways" [27] instead of only "insular roads" as stated in the 1942 Act.

In 1951 the Legislature again considered the speed limits. Act No. 156 of April 26 of that year amended § 15 as above stated. That amendment preserved the basic rule of "due care", fixed speed limits for certain specific cases and very significantly eliminated the general maximum speed limit. It also extended the powers of the Commissioner, authorizing him in general "to establish zones and fix speed limits therefor" within the limits fixed by the Act, contrary to the 1946 provision which only authorized him, as we have indicated, to establish "zones on *public highways* and to fix speed limits therefor." (Italics ours.) Furthermore, the 1951 amend-

---

[26] Section 10 also ordered to "reduce the speed" on approaching animals and schoolhouses and street intersections.

[27] The definition of "public road" of the 1946 Act is the same of the 1942 Act.

ment did not introduce any change whatever in the general powers of the Commissioner "regulating traffic on the public highways."

This brief survey of the traffic Acts dating from 1940 establishes the following facts:

1. All the Acts have included a basic rule of "due care" or "due control of the vehicle."

2. Together with that basic rule specific speed limits have always been stated to give specific content to the general standard. However, those limitations have been less elaborated each time. In 1940 they applied to school buildings or lands, railroad or streetcar crossings when the view was obstructed, business districts, grade-crossings where the view was not obstructed and public parks, and a final limit of 45 miles an hour was provided for all other occasions. In 1942 a general maximum limit of 48 kilometers was fixed, and specific limits for the urban zones, curves and heavy vehicles. In 1946 a maximum limit (45 miles) was also established and specific limits for an urban zone, curves and intersections. Finally in 1951, the maximum limit was eliminated for the first time and limits were again specified for urban zones, curves and intersections and school zones.

3. Parallel to that reduction in the details there has been a corresponding increase in the authority conferred upon the Commissioner (Secretary) to fix speed limits. In 1940 he could establish them only for bridges, viaducts and public breakwaters, while the local authorities had most of the authority to complement the provisions of the Act. In 1942 the delegation to the local authorities was eliminated and the Commissioner was empowered to prescribe "additional rules regulating traffic on insular roads." In 1946 that general delegation covered "public roads" instead of only "public highways" and the Commissioner was specifically authorized to establish "zones on public highways and to fix speed limits therefor," within the limits fixed by the Act. Finally, in

1951 he was authorized to establish "zones and fix speed limits therefor," without specifying that it must be on "public highways," maintaining at the same time the general delegation as established in § 17(o) of the 1946 Act. It is evident that in 1951 the Legislature considered that the best plan to regulate traffic was one by which some speed limits would be fixed by law and at the same time authority was to be granted to the officer in charge of administering the system to regulate all other situations.

In 1957 the Legislature again confirmed its desire to delegate to the Secretary of Public Works almost the entire burden of the regulation. Act No. 1 of August 5, 1957 (Sp. Sess. Laws, p. 515) established general limits for urban and rural zones and some special cases and provided that the Secretary "may establish by regulation, both for the urban and rural zones, speed limits higher or lower than those above-stated, through the establishing of zones where signs and warnings shall be posted indicating the maximum speed established for the zone. In no case shall the Secretary fix speed limits higher than fifty (50) miles per hour."

That trend of our traffic laws is not unusual. It is the same one followed by all modern governments in numerous aspects of public administration to meet social problems of such scope and complexity that they can not be regulated by the ordinary legislative channels.

Full confirmation of the legislative intent to give authority to the Secretary over both the urban and rural zones is found in the words pronounced by the Chairman of the Juridical Penal Committee upon explaining the scope of the 1951 amendment to his colleagues in the House of Representatives.

"Mr. Speaker and colleagues: This bill tends to amend Act No. 279 of 1946, that is, the Traffic Act. It tends to inflict a higher penalty on those persons who drive while intoxicated, and likewise, to establish, to provide, that the Commissioner of the Interior may regulate traffic by determining certain speed

limits in the urban as well as rural zones of Puerto Rico. That is what the bill establishes as to penalties and regulation of traffic." [28]

What would be the consequences if we should adopt the interpretation given by the trial court? [29] There would be a general maximum limit of 25 miles an hour for the urban zone and of 15 miles (subject to certain conditions) for curves, intersections and school zones. The Secretary might reduce those limits, but he would not be able to fix limits for other zones. Consequently, in all insular highways, municipal roads, bridges, viaducts, public breakwaters, etc., in other words, in all places not comprised in the enumeration above, there would be no specific speed limits and there would prevail, as the only legal standard regulating the speed of motor vehicles, the general principle of "due care" and "due control" which is provided by § 15(a). Upon applying that principle in the thousands of cases under their consideration, the judges would necessarily take it upon themselves to fix the speed limits. It is obvious that the Judiciary does not have the technical knowledge nor the equipment nor the time to assume such a responsibility and even if it did, the process would be endless. We cannot attribute to the Legislature the absurd notion of depriving the rural zone of specific speed limits or of entrusting the judges with the performance of that task.

In several of those Acts, from and after 1916, the Legislature provided that the violation of specific speed limits would constitute prima facie evidence of the offense of driving

---

[28] *Minutes of the House of Representatives of Puerto Rico*, 819 (1951). In its report to the Senate on the bill which later became Act No. 1 of August 5, 1957, the Juridical Penal Committee said that: "The purpose of this bill is to reaffirm the authority of the Secretary of Public Works to regulate speed limits in the urban and rural zones of Puerto Rico." *9 Journal of Sessions* 2231 (1957).

[29] As we have indicated, the Legislature, convened in a special session, acted rapidly to dissipate the effects of the order appealed from, amending § 15 in the above-described manner.

without "due care" while in others it indicated that the transgression of those limits would constitute per se an offense. That difference is significant only as to who bears the burden of proof at the trial, once the complaint charges the offense described by the Act. *People* v. *Casanovas*, 38 P.R.R. 197, 200 (1928); *Polo* v. *White Star Bus Line, Inc.*, 54 P.R.R. 229, 233 (1939); 4 Wigmore, Evidence, § 1356. It is not pertinent herein in ascertaining the purpose of the Act by examining its legislative history. In so ascertaining we find that one way or the other the Legislature, from 1907 until now, furnished the judges and the police with specific standards on speed limits, or authorized some officer to furnish them, and that it *never* established the principle of "due care" isolatedly, leaving to the judges full power to give it content. It could hardly be supposed that in 1951, when the avalanche of vehicles which today floods our streets and highways had already begun,[30] it was the purpose of the Act to leave the rural zone destitute of specific speed limits, or, if we considered the other interpretation proposed to us, to subject administrative discretion to such reduced limits that upon being applied to said zone they would bring the traffic to a standstill.

It is somehow paradoxical that as to this offense, one of the simplest and certainly the most advertised of our penal statutes, it could be suggested that it has the constitutional defect of vagueness, while at the same time we are offered as correct another interpretation of the same Act based on reasons of logic, history and sociology. As the Federal Supreme Court has explained: "The constitutional requirement of definiteness is violated by a criminal statute that fails

---

[30] In its *Annual Report* of 1955–56 the Department of Public Works states that "the increase in registration of motor vehicles in Puerto Rico has been such, that from thousands of persons that were registered for each vehicle in the first years of this century, the rate has dropped to an average of 38.8 persons per vehicle in 1950. This, notwithstanding the fact that the population practically doubled in the course of these years." (At 30.)

to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States* v. *Harris*, 347 U.S. 612, 617 (1954). Page 624 mentions numerous examples of penal enactments which the court has upheld against a charge of vagueness. These include from the Sherman Act forbidding "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations," to the Smith Act forbidding "to conspire 'to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence . . . .' " We have examined the applicable precedents [31] and are convinced that the Act in question is not defectively vague as alleged. Certainly, several of the provisions upheld by the Federal Supreme Court, among them the two cited, have a much wider scope than that of the present case.

We must not fall into the superficiality of believing that indefiniteness makes a criminal statute void simply because it requires interpretation. As professor Jiménez de Asua points out, all statutes, even the "very clear ones," require interpretation. "Every statute, when applied, is interpreted, since in conforming its contents to the real fact a process of subsumption is created, to which the interpretative organs (sometimes the lawmaker and the scientist and always the judge) contribute, by grammatical and teleological proceedings, and with declarative, restrictive, extensive or progressive results."[32] As to criminal statutes "the strict legality of punitive law must be harmonized with the necessary teleolo-

---

[31] See Quarles, *Some Statutory Construction Problems and Approaches in Criminal Law*, 3 Vand. L. Rev. 531, *539–543 (1950); Due Process Requirements of Definiteness in Statutes*, 62 Harv. L. Rev. 77 (1948).

[32] 2 *Tratado de Derecho Penal* 353 (1950).

gical interpretation of juridical standards. Recognizing that criminal law has traits of greater certainty and stability than other branches, it is impossible to believe that penal law, *sensu strictu*, suffices in itself and that it is sufficient to interpret it literally. It is not a complete system without loopholes, so that with the simple logical proceeding, based on the written legal provisions, all questions can be decided."[33]

The Federal Supreme Court very recently has expressed the same opinion by unanimity. Mr. Justice Frankfurter said in *United States* v. *Shirey*, 359 U. S. 255, 260 (1959) :

"Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.' This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. Statutory meaning, it is to be remembered, is more to be felt than demonstrated, or, as Judge Learned Hand has put it, the art of interpretation is 'the art of proliferating a purpose.' In ascertaining this purpose it is important to remember that no matter how elastic is the use to which the term scientific may be put, it cannot be used to describe the legislative process. That is a crude but practical process of the adaptation by the ordinary citizen of means to an end, except when it concerns technical problems beyond the ken of the average man." (Citations eliminated.)

The order appealed from is set aside and the case remanded for further proceedings compatible with this opinion.

Mr. Justice Hernández Matos did not participate herein.

---

[33] *Id.* at 340. We have already stated on several occasions that interpretation shall not be governed by strict rules or canons, and that the safest course for the judge is to canvass the words of the Act and the circumstances of its approval and application in order to discover the aim sought by the statute. *People* v. *De Jesús*, 70 P.R.R. 36, 40 (1949); *People* v. *Mantilla*, 71 P.R.R. 35, 42 (1950) and cases cited therein; *Borinquen Furniture* v. *Dist. Court; Umpierre, Int.*, 78 P.R.R. 858, 861 (1956); *Banco de Ponce* v. *Sec. of the Treasury*, 81 P.R.R. 432, 439 (1959); *People* v. *Toro*, 81 P.R.R. 462, 466 (1959).

MR. JUSTICE SANTANA BECERRA, dissenting.

In the Río Piedras Part of the District Court complaints were filed against six drivers for violation of § 15(b) of the Automobile and Traffic Act, Act No. 279 approved April 5, 1946 (Sess. Laws, p. 598), as subsequently amended. In four of said complaints the defendants were charged with driving in sections of Highway No. 1 and the 65th Infantry Highway in a *"rural zone"*, at speeds of 60, 65, 70 and 65 miles per hour, respectively, the speed in said sections being regulated at 50 miles per hour according to visible signs posted on both sides of the highway by the Secretary of Public Works of the Commonwealth of Puerto Rico. In the other two complaints the defendants were charged with driving in sections of Highway No. 20 from Caguas to Guaynabo, in a *"rural zone"*, at speeds of 50 and 40 miles per hour, respectively, the speed in said sites being regulated at 25 miles per hour according to similar signs. All of them charge the commission of the offense during November, 1956. Demurrers were filed to the complaints on the ground that the Secretary of Public Works was not authorized to regulate the speed in the rural zones of Puerto Rico, and also, that upon the Secretary exercising the authority to fix speed limits he was compelled to do so within the limits fixed by the Automobile and Traffic Act. The defendants requested the dismissal of the complaints and that they be exonerated and acquitted of the offenses charged. On December 27, 1956 the District Court granted said demurrers, without ordering, as we shall see hereinafter, that it was not allowed the filing of new complaints.

On January 4, 1957 the Secretary of Justice filed in the San Juan Part of the Superior Court a petition for certiorari to review the decisions of the District Court granting the above-stated demurrers and the exoneration of the defendants. The Superior Court ordered that the original records be sent thereto to review the proceedings. Some of the defendants requested intervention and they appeared person-

ally together with the respondent District Judge, who, among other contentions, raised the question that his actions were not reviewable because the judgments were unappealable. After the petition was heard the Court decided the question on the merits upholding the District Court, without stating its authority or power to review in view, perhaps, of its decision in favor of the defendants.

I

*Authority or Power of the Superior Court to entertain the case on its merits*

Section 150 of the Code of Criminal Procedure (1935 ed.) provides that the demurrer is the allegation that, *admitting* the facts as stated in the information, such facts do not constitute an offense whereby the defendant should be put on trial.[1] Section 153 says that the defendant may demur to the information when it appears from the face thereof: . . . (3) "that the facts stated do not constitute a public offense." Section 156 provides that upon considering the demurrer the court must give judgment, either allowing or disallowing it and an order to that effect must be entered upon the minutes; and § 157 subsequently provides that if the demurrer is allowed, *"the judgment is final"* upon the information demurred to, and *is a bar* to another prosecution for the same offense, unless the court is of the opinion that the objection on which the demurrer is allowed may be avoided in

---

[1] This section refers to an information. The complaints before the District Court, formerly municipal courts, are governed by §§ 22 and 23 *et seq.* applicable to the Code of Criminal Procedure. But by the Act of March 10, 1904 (Sess. Laws, p. 103) it was provided that "all the proceedings in said municipal courts must be conducted according to the rules and proceedings in force in the District Courts." Shortly thereafter, on May 28, 1904 (Sp. Sess. Laws, p. 11) another provision was approved, possibly explanatory as to the intervention of the district attorney, providing that the procedure for the *institution and trial* in the municipal courts shall be the same as provided by law for criminal cases in the justice of the peace courts. *Cf. People* v. *Draper*, 134 Cal. App. 787, 22 P.2d 604.

a new information, and directs a new information to be filed.[2] In harmony with the foregoing § 158 orders the defendant to be discharged or the bail exonerated if the court does not order a new information or permit it to be amended. We have decided that the court must, specifically, *direct* the new information. *Garcia* v. *District Court*, 68 P.R.R. 20. *Cf.* *People* v. *Calero*, 68 P.R.R. 295. Section 161 establishes that when the objections mentioned in *§ 153* appear on the face of the information, they can only be taken by demurrer, except that the objection to the jurisdiction of the court over the subject matter of the information, *or alleging that the facts stated do not constitute a public offense*, may be taken at the trial, under the plea of not guilty or after the trial, in order to secure an arrest of judgment.

Pursuant to this section the demurrer that the facts stated do not constitute a public offense is also a plea which alleges the innocence of the defendant and denies at the bottom all criminal liability. *Cf. Batalla* v. *District Court*, 74 P.R.R. 266.[3]

There is no doubt that with regard to the District Court there was a judgment or final disposition of the cases favorable to the defendants exonerating them from the offense under the Court's interpretation of the Automobile and Traffic Act. Considering the nature of the demurrer as a question of law it was not proper for the court to order the filing of the amended complaints, since it was not one of those demurrers that could be *"avoided"* (§ 157) in a new com-

---

[2] The text of origin (§ 1008 Cal.) reads:

"The judgment is *final* upon the information demurred to, and is a bar to another prosecution for the same offense."

[3] If we examine the appearances of the defendants which gave rise to the decision of the District Court, we find that they constitute a plea of not guilty, since the defendants expressly deny therein the authority of the Secretary of Public Works to fix the speed limit violated for which they were prosecuted. The fact that the issue involved a question of law concerning the interpretation of the Act does not remove from their appearances the condition of a plea of not guilty denying criminal liability.

plaint. Should the defendants have been arrested or admitted to bail, it was compulsory to order their immediate discharge or the cancellation of bail (§ 158).[4]

The point then to be considered is whether the final disposition made by the District Court in favor of the defendants is somehow reviewable at the request of the Commonwealth, or if on the contrary it constituted a final and conclusive judgment. Even where the Spanish version of § 157 uses the term *"sentencia definitiva"* (*final* judgment). I agree that it should be construed as an *"unappealable"* judgment since if the State is entitled to review it, the decision of the District Court was not *"final"* for the purposes of § 157. On the contrary, if the action of the District Court exonerating the defendants from the commission of the public offense is not reviewable, we must agree that the judgment was *unappealable* and also *final* and *conclusive* (*firme*) for the purpose of said section, and consequently, there would be a bar for these defendants to be submitted to

---

[4] It has been generally established in the decisions of the United States, including the federal jurisdiction, even without statutory provisions such as our § 157, that an order, decree, decision or other action of the trial court sustaining a demurrer to an information or complaint, when neither the court itself nor the statute provided any amendment or the filing of a new complaint or by some means the defendant was not left subject to a subsequent action to answer for the offense, constitutes a final judgment or disposition exonerating him from criminal liability insofar as said court and said proceedings are concerned, for recognizing to the State its right to review when it has such right, as well as to deny it such review in the absence of its right thereto. *Cf. People v. Canals*, 48 P.R.R. 775; *The People v. Fajardo*, 21 P.R.R. 424; *The People v. Fontana*, 16 P.R.R. 626; *United States v. Sanges*, 144 U. S. 310; *People v. Young*, 31 Cal. 564, (1867); *People v. Stacey*, 34 Cal. 307, (1867); *People v. Ah Own*, 39 Cal. 604, (1870); *People v. More*, 68 Cal. 500, (1886), 9 Pac. 461; *People v. Jordan*, 65 Cal. 644, (1884), 4 Pac. 683; *People v. Draper*, 134 Cal. App. 787, (1933), 22 P.2d 604; *State v. Blair*, 92 Iowa 28, (1894), 60 N. W. 486; *United States v. Cadarr*, 24 App. D. C. 143 (1918); *State v. Swope*, 20 Ind. 106, (1863); *State v. Leblanc*, 160 La. 1053 (1926), 108 So. 87; *State v. Logan*, 1 Nev. 427, (1865); *State v. Kruger*, 34 Nev. 302, (1912), 122 Pac. 483; *State v. Vaughn*, 15 Okla. 187, (1918), 175 Pac. 731.

See in addition, the compilation of cases on the subject in the Annotation published in 92 A.L.R. 1137. Some cases involve the technical procedural question arising occasionally in the light of specific provisions of the

retrial under those complaints.[5] It is well to anticipate that in those criminal proceedings *originating* in the former District Courts, now Superior Court, the State was granted, since the adoption of the Code in 1902, the right to review by appeal to the Supreme Court, a judgment for the defendant on a demurrer to the information (Code of Criminal Procedure, § 348). So that the problem is reduced to deciding whether in a similar situation the State enjoys the right to a review in proceedings which originated and were heard in the former municipal courts, today District Court.

Before continuing with the legislative history of our procedure as to this aspect, perhaps it would be convenient to point out certain considerations of historical order which may serve as a premise for the issue at bar. Historically, under the common law as it developed in the states of the Union, neither the State nor the United States were vested with any right of appeal or review whatsoever in criminal cases, even when it dealt with a conclusion of law which did not involve a verdict or decision of acquittal on the evidence. In 1892 the United States Supreme Court delivered a fundamental and decisive opinion on the subject: *United States* v. *Sanges*, 144 U. S. 310. In this case the indictment charged the defendants with having injured the victim in the exercise and enjoyment of the right and privilege, secured to him by the

---

local statute, as to whether for the purpose of finality a formal judgment exonerating the defendant is necessary or whether the order, determination or expression of the court sustaining the demurrer without further reservation is sufficient. The consensus of opinion of the courts has been disfavorable to the procedural technicality in the face of the real and practical fact that the action of the court sustaining the demurrer terminates the proceedings before said court in favor of the defendant, unless said proceedings, as we have pointed out previously, are reserved. California's most recent case law on the subject must be considered in the light of the statutory changes made to its procedure by amendments of the year 1951. *Cf. People* v. *Alves*, 315 P.2d 755.

[5] It is well to point out that the classical constitutional principles concerning jeopardy are not involved herein. The impediment is merely statutory pursuant to the provisions of § 157.

Constitution and laws of the United States, to testify against the violators of the internal revenue laws, assaulting and murdering the victim after the latter testified before a grand jury in obedience to a subpoena and while he was still a witness. A demurrer to the indictment was filed alleging that there was no such right and privilege secured to the party conspired against. After the demurrer was sustained and the indictment quashed, the United States requested review before the Supreme Court by way of a writ of error under a provision of the Judiciary Act of 1891 which granted appeals or writs of error to the Supreme Court from decisions of the District Courts in any case involving the construction or application of the Constitution of the United States.

The first question posed by Mr. Justice Gray, speaking for the Court, in an opinion which dismissed the writ of error issued for want of jurisdiction, was whether such statutory provision of the 1891 Act permitted the State a review in criminal cases. After a thorough analysis of the common law in this respect exactly as it had been applied by the state courts with the marked exception of Pennsylvania, Mr. Justice Gray concluded that under the common law neither the United States nor the different states could review a criminal judgment except in those cases where the *statute expressly gave the State* the right of appeal, the Supreme Court having rejected the doctrine of Pennsylvania and possibly Maryland to the effect that a review could be sought by the state in the absence of express provision prohibiting it. In the course of the opinion Mr. Justice Gray, after considering the situation in England, said:

"But whatever may have been, or may be, the law of England upon that question, it is settled by an overwhelming weight of American authority, that the State has no right to sue out a writ of error upon a judgment in favor of the defendant in a criminal case, except under and in accordance with express statutes, *whether that judgment was rendered upon a verdict of*

*acquittal, or upon the determination by the court of a question of law."* (Italics ours.)

He added:

"But the courts of many States, including some of great authority, have denied, upon broader grounds, the right of the State to bring a writ of error in any criminal case whatever, *even when the discharge of the defendant was upon the decision of an issue of law by the court, as on demurrer to the indictment, motion to quash, special verdict, or motion in arrest of judgment."* (Italics ours.)

. . . . . . . .

"In many of the States, indeed, including some of those above mentioned, the right to sue out a writ of error, or to take an appeal in the nature of a writ of error, in criminal cases, has been given to the State by positive statute. But the decisions above cited conclusively show that under the common law, as generally understood and administered in the United States, and in the absence of any statute *expressly giving the right to the State,* a writ of error cannot be sued out in a criminal case after a final judgment in favor of the defendant, *whether that judgment has been rendered upon a verdict of acquittal, or upon a determination by the court of an issue of law.* In either case, the defendant, having been once put upon his trial and discharged by the court, is not to be again vexed for the same cause, unless the legislature, acting within its constitutional authority, *has made express provision for a review of the judgment at the instance of the government."* (Italics ours.)[6]

On March 2, 1907, fifteen years after the *Sanges* decision went into effect, Congress approved the Criminal Appeals Act, 34 Stat. 1246; 7 F.C.A. Title 18, § 682; 18 U.S.C.A. § 682, formerly (now 3731), granting the United States the right to a writ of error (appeal thereafter), direct to the Supreme Court from a decision or judgment of a district court quashing, setting aside, or sustaining a demurrer to any indictment or any count thereof, where such decision or judgment was based upon the invalidity or construction of the statute sup-

---

[6] Pursuant to the state decisions supporting the opinion, the term "writ of error" is used in its general meaning to refer to any form or means of review *not* expressly granted by statute to the state.

porting the indictment. In 1942, by amendment to the statute, the United States was granted appeal before the Courts of Appeals from a decision or judgment of a district court in a similar situation, in cases not directly appealable to the Supreme Court, that is, where the decision or judgment sustaining the demurrer did not involve the validity or construction of the statute. After the 1907 Act the right of the United States to review in criminal cases, has been, as it already was and is mostly today for the States, a question ruled by positive laws. But since the statutes to such effect repealed the common law, they have always been applied and construed most restrictively against review.[7]

The historical and jurisprudential basis informing of the state's right to review in criminal cases having been set forth, let us examine the problem in the light of our legislation. In 1902 when we transferred here the criminal procedure of California, in which state the foregoing principles were strictly followed, we adopted § 348 of our Code of procedure granting the prosecution the right to take an appeal, among other things, "from a judgment for the defendant on a demurrer to the information." This section forms part of Title IX regulating appeals to the Supreme Court "in a criminal action

---

[7] The National Supreme Court has been very alert against the confusion that frequently arises as to whether the lower court has construed the *statute*, or whether it construed the *indictment* as is normally the case in which it is alleged that the latter does not state facts which constitute the offense charged or that it is insufficient, in which case the government has been denied review under the 1907 Act. It has not always been easy to distinguish one situation from the other and hence the scrutiny displayed by the court. See: *United States* v. *Wayne Pump Co.*, 317 U. S. 200 and the compilation of cases on the subject cited in the *Annotation* that follows in 87 L. Ed. 191; and *see:* the decisions of practically every state covering more than a century of case law which are outlined in the *Annotation* published in 92 A.L.R. 1137 following the case of *People* v. *Barber*, 348 Ill. 40, 180 N. E. 633 (1932) and which fully illustrates the principle of restrictive construction against review, of those statutes granting it to the state in criminal cases. Here we have also construed our statute restrictively. (§ 348 Code Crim. Proc.) *Cf. People* v. *Pagán*, 44 P.R.R. 233; *The People* v. *Martínez et al.*, 15 P.R.R. 725; *The People* v. *Allan*, 17 P.R.R. 36.

originating before any of the district [Superior] courts."
(§ 345.) Section 348 is the equivalent to § 1238 of Califor-
nia which granted like appeal in cases originating in the
superior courts of said state. As to the courts inferior to the
superior court, which in 1902 were the justice courts and the
police courts and other lower courts included under this head-
ing, California provided in § 1466 of its criminal procedure
that either party could appeal to the superior court of the
county from a judgment of a justice's or police court, in like
cases and for like cause as appeals could be taken to the
Supreme Court,[8] thus extending to the proceedings before
those inferior courts, by reference, the provisions of § 1238
equivalent to our § 348.

We did not transfer § 1466 to our procedure which if we
had, would have permitted the state to review by appeal to
the former district courts the judgment of a municipal court
exonerating the defendant by virtue of a demurrer to the
information. On the contrary, the sole means of review of
the criminal judgments rendered by municipal and justices
of the peace courts instituted by us was an appeal in the form
of trial de novo in the District Court, such a trial to be held
only at the request of the defendant, never at the request of
the People.[9] Notwithstanding the procedural precedent of
California under §§ 1466 and 1238, which also existed in other
areas, and the broad jurisdiction in criminal cases vested
upon the municipal courts, our lawmaker never granted by
law to the state review from the criminal decision of said
courts exonerating a defendant by way of a demurrer.

---

[8] The original version provided: "In like cases and for like cause as
appeals may be taken to the Supreme Court." According to the present
text of § 1466, the right to appeal is granted in the text of the provision
itself and not by reference to § 1238. 51 West's Anno. Cal. Codes,
Penal, § 1466.

[9] Sections 3, 29(4), (5) and 48 of the Code of Crim. Proc.; § 2 of the
Act of May 28, 1904 granting an appeal from the final judgment of a
municipal court to the defendant "only", in the manner provided for
appeals from the justice of the peace courts: (trial de novo).

After the Judiciary Act now in force was approved in 1952 —Act No. 11 of July 24, 1952 (Sp. Sess. Laws, p. 30)—the trial de novo disappeared and the system was changed to a similar one existing in California in 1902, and which still exists, under § 1466. Section 19 of said Act established the right of appeal to the Superior Court from any final judgment of the District Court, the procedure on appeal to be followed in accordance with the rules established by the Supreme Court. From and after October 15, 1952 this Court established the Rules for Appeal from the District Court to the Superior Court, and in Rule 9 it was provided that they would be applicable to appeals in criminal cases, with the exception that ". . . *only* the defendant may appeal." There was nothing to preclude, not even the Judiciary Act itself, the Rules from providing the State with a review before the Superior Court similar to that of § 348 in applicable cases, or any other kind of review compatible with constitutional principles. The Court, on the contrary, upheld a clear and definite public policy which had governed since the beginning of the century under our trial standards.

In the light of the foregoing juridical and historical principles of law in our applicable positive statutes, it is obvious that the Commonwealth cannot obtain, by the means employed here, a review of the final decision or disposition made by the District Court in these cases by virtue of which the defendants were exonerated. It cannot obtain indirectly the review which was not only not granted thereto by statute directly and expressly,—*Cf. United States* v. *Sanges, supra,* and state cases to the same effect—, but rather which was prohibited thereto when it was statutorily provided that in such cases *only* the defendant could appeal to the District Court, thereafter Superior Court. Not even the isolated historical position adopted by Pennsylvania would favor the Government because here the review has been statutorily denied. The history of our positive legislation and its historical and jurisprudential antecedents afford no basis either to conclude that

when the lawmaker originally, and this Court subsequently, provided that *only* the defendant could appeal, the appeal was visualized within a technical procedural meaning, as a means or vehicle of review as distinguished from others. The provision was that the final decision of the municipal courts, now District Court, would not be reviewable in criminal cases except at the request of the defendant. Nor, in my opinion, could it have been the intention of the lawmaker at the beginning of the century, upon denying the Commonwealth a direct appeal within the same proceeding, that the latter should have a review in an indirect or substitute manner such as the one used here. The literal text of the certiorari Act of 1904, pursuant to the historical interpretation that we gave it up to the *Pérez* decision, 69 P.R.R. 4, delivered in 1948, clearly did not include on its face a review of the matter comprised herein and the fact that after the *Pérez* decision certiorari has become, —except for the discretionary aspect of its issuance—practically an appeal or general review, *Cf. Villaronga, Comm'r of Education* v. *Dist. Court; Feliciano, Int.*, 74 P.R.R. 306, where the sufficiency and burden of proof were considered, far from upholding the authority of the Superior Court to entertain this case casts greater doubt about it, since it palpably shows that the aim of the Commonwealth is to obtain, by indirect method, the benefit of an appeal which was not directly permitted thereto.

· The cases of *People* v. *Super. Court; Somohano, Int.*, 79 P.R.R. 719 (1956) and *People* v. *District Court and Colón, Int.*, 74 P.R.R. 783 (1953), cited by the Secretary of Justice to the Superior Court in support of the authority of that court to entertain the matter do not in my opinion support such authority. Both cases originated in the Superior Court. In the former a demurrer was sustained on the ground that the facts charged did not constitute a public offense. That decision of the Superior Judge was always reviewable by us by appeal, under § 348. The fact that we reviewed it by certiorari instead of appeal, lacks importance because as of 1952

the Judiciary Act authorized us to review by certiorari any order or judgment of the Superior Court and after the amendment to said Act by Act No. 115 of 1958 (Sess. Laws, p. 279), any order. In the *Colón* case we also reviewed by certiorari the judgment of a Superior Judge dismissing an information. The defendant alleged that said decision was not appealable by the State under § 348. We upheld our discretionary authority to review, even without considering the Judiciary Act, specific actions of the Superior Court in criminal cases prejudicial to the State, which authority, at times in a more ample fashion and at other times more restrictively, has been sustained by some state courts of last resort. As an example, see: *State* v. *Coleman*, 190 Atl. 791 (1937) and the *Annotation* following it in 109 A.L.R. 793 —*Right of State to writ of certiorari in criminal case.*— But this doctrine which has a somewhat "inherent" authority to review, is rationally part of the mission of the courts of last resort to see that justice is properly dealt out to the defendant as well as to the State, and to establish uniform standards in the administration of criminal justice.[10]

Regardless of the scope of the principle applied in the *Colón* case as to our power to review by certiorari in such cases, which authority as of 1952 is a question of positive law, this power does not extend to the Superior Court, which is not a court with general revisory or appellate jurisdiction, and which can only review the final decisions of the District Court exclusively as provided by law, which in this case is pursuant to the provisions of Rule 9.[11]

---

[10] As a rule these cases cover situations where courts have acted without or in excess of jurisdiction or authority of law or without legal ground, and the State has been unduly deprived of its legitimate means to support its case. They do not ordinarily include the review in favor of the State, in the absence of a statute permitting it, of actions within the scope of legal jurisdiction and authority of the lower courts.

[11] I have found no precedent in our case law of the procedure followed here. Under the same circumstances, up to where I have been able to search, I have not found a similar one in other jurisdictions. The case which most resembles it is that of *State ex rel. Brown* v. *Brinker*, 114

I believe, in harmony with all the foregoing, that the Superior Court lacked jurisdiction over the subject matter, even when an appeal within its original jurisdiction was sought. Praiseworthy as is the purpose of the Department of Justice in view of the public interest and the number of cases which could have been affected by the decision of the District Court, it does not warrant a change in the procedure of criminal prosecution provided by law. This case probably indicates the need to amend *Rule 9* so as to permit the State some type of review to the Superior Court in criminal cases, or to legislate so as to authorize, in particular cases, such review directly to this court, as was done by Congress in 1907 and pursued by other states for similar purpose.

I am of the opinion that the judgment appealed from should be set aside and the case remanded to the Superior Court with instructions that it declare itself without jurisdiction on the matter or authority to entertain and decide this

---

Wash. 47, 194 Pac. 574 (1921), where a justice of the peace sustained a demurrer to the complaint discharging the defendant. At the request of the State the Superior Court issued certiorari to review that decision and the defendant and the judge appealed. The Supreme Court of Washington held that the writ was properly issued under a statute authorizing the issuance of a writ of review addressed to an inferior court when the latter has exceeded its jurisdiction, or to correct any erroneous or void proceeding, *or a proceeding not according to the course of the common law*. Considering that that statute was broader in its scope and operation than that of other states, the Supreme Court granted the review. But a year later, in *State* v. *Stratiner*, 206 Pac. 353 (1922), the Supreme Court itself declined to review at the request of the State under the same statute, the nonappealable order of a Superior Court which suppressed the testimony of the prosecuting attorney as to certain stolen property, in the light of another statute which denied the state an appeal in a criminal case, except from those actions expressly included therein. Holding this statute as controlling the Supreme Court in its opinion (206 Pac. 354), stated: "To hold that we can review by certiorari what we are prohibited from reviewing by appeal would be merely to circumvent the legislative intent. In some instances we may by certiorari review questions which the Legislature has failed to authorize us to review by appeal; but we should not have any power to review by certiorari that which the Legislature has said shall not be reviewed by appeal. In short, the Legislature did not contemplate that we should have power, at the instance of the state, to review such questions as are in this case, either by appeal or certiorari." Citations.

case on the merits. In view of the fact that the majority of the Court upholds such authority or jurisdiction of the Superior Court, which majority binds me, reserving my conclusion, I shall set forth the grounds which bar me from concurring on the merits.

## II

### Consideration of the question on the merits

Although the Superior Judge considered the problem in terms of whether or not the Automobile and Traffic Act of 1946, as amended in 1951, granted authority to the Secretary of Public Works to fix speed limits in the rural zones of the roads in Puerto Rico, and decided it stating that his power to fix said speed limits cannot be exercised in any manner whatsoever *with respect to the roads of the rural zone*, such is not the question actually involved. That was unquestionably a wrong approach and as of now I want to definitely establish that the Secretary of Public Works was legally authorized to regulate speed in both urban and rural sites. The true legal problem raised is whether or not the defendants committed a public offense on the ground *itself* that they were driving at the alleged speed, which in turn depends on whether at such places, either urban or rural zones, there was a permissible maximum speed limit established by the Act or by an authority with legal power therefor, which violation was punishable as an offense. Since the case turns primarily on a problem of interpretation of the statute in which the legislative intention plays an important role, I believe it convenient to make a brief historical outline of the traditional public policy prevailing from the beginning of the century with respect to punishing as a public offense the act *in itself* of driving at a specific speed.

Although by the Act of March 14, 1907 (Sess. Laws, p. 368) specific provisions on the speed of motor vehicles were adopted for the first time, it was with the enactment of Act

No. 75 of April 13, 1916 (Sess. Laws, p. 140) that a fixed legislative standard began to govern for many years concerning the regulation of the speed of said vehicles. By § 12(a) of this Act it was provided that the persons operating motor vehicles on public roads should at all times exercise *due care* and take reasonable precautions to insure the safety of persons and property, enumerating a set of specific rules to be observed by drivers. Section 13(a) provided that "The speed of motor vehicles shall at all times be regulated with due care and with due regard to the width, amount of traffic and use of the highway, but the driving at any time of any motor vehicle on the public highway at any rate of speed faster than forty-eight kilometers an hour, or within the urban zone of a municipality faster than twenty-four kilometers per hour, shall be prima facie evidence that it was being driven without *due care*." In interpreting this provision we decided in a number of cases that the driving of an automobile at a speed in excess of the speeds mentioned did not in itself constitute a public offense, but rather prima facie evidence that the vehicle was being driven without proper care. The reckless driving and not the violation of the limit constituted the offense. *People* v. *Casanovas*, 38 P.R.R. 197 (1928); *People* v. *Rodríguez*, 40 P.R.R. 10 (1929); *People* v. *Ramos*, 43 P.R.R. 68 (1932); *Polo* v. *White Star Bus Line, Inc.*, 54 P.R.R. 229 (1939). *Cf. People* v. *Rodríguez*, 70 P.R.R. 21, 26 (1949). Notwithstanding those decisions the Legislature never amended Act No. 75 to punish as a public offense the mere act of driving an automobile at a specific speed, nor to fix legally permissible speed limits for these vehicles. There was no change of legislation from 1916 until 1940.

Act No. 140 of May 6, 1940 (Sess. Laws, p. 782) known as the "Uniform Act Regulating Traffic on Highways", did not expressly repeal the 1916 Act, but it established in § 20(a) a *Basic Rule* on speed of a nature similar to the provisions of the first part of § 13(a) of Act No. 75, only in a more elabor-

ate form. The violation of said basic rule, which was penalized in the 1916 Act by § 18, was pronounced misdemeanor. The same § 20 (b) established maximum speed limits of 15, 20, 25 and 45 miles an hour on certain and specific places and times and punished as *obstinate driving*, with stronger penalties, the driving of a vehicle in excess of said speed *if upon so doing the basic rule or other specific regulation in the Act was violated*. It may be observed that although this statute did not follow the rule of prima facie evidence of the 1916 Act, the fixing of maximum speed limits did not create per se a public offense either. It only tended to aggravate the penalty if upon violating the basic rule or other regulation of the Act, the vehicle was driven in excess of the speed fixed for each section.

Act No. 55 of April 27, 1942 (Sess. Laws, p. 526) expressly repealed the 1940 Act and Act No. 75 of 1916. But it restated in §§ 10 (a) and 11 (a), except for two changes of expression, the provisions contained in §§ 12 (a) and 13 (a) of the 1916 Act. It is curious to observe that the lawmaker reestablished these provisions, which as construed by us did not make the act in itself of driving at any speed a public offense, when in the full blast of war the traffic problems were increasing and at the time when Military Highway No. 2 was being constructed and inaugurated as an expressway, inviting the irresponsible driver to drive with frantic speed.

Act No. 279 of April 5, 1946 repealed Act No. 55 of 1942. Paragraph (a) of § 15 reenacted identical general standard of conduct to that contained in the first part of § 13 (a) of Act No. 75 of 1916. In § 15 (b) it was provided as follows:

"It shall be deemed prima facie evidence that a vehicle is driven at an unreasonable speed and against the provisions of the preceding clause (a), if said vehicle is operated at a speed of more than twenty-five (25) miles an hour in the urban district; or at a speed of more than fifteen (15) miles an hour in rounding a curve or intersection, where the view is not clear at a distance of one hundred (100) meters towards the front, or

when passing a district where public schools are located; and in all other cases, at a speed of more than forty-five (45) miles an hour; *Provided,* That the Commissioner of the Interior is hereby authorized to establish zones on public highways and to fix speed limits therefor."

The rule of prima facie evidence of the 1916 Act was kept alive, although the limits of 48 and 24 kilometers within the rural and urban zones were increased, respectively, to 45 and 25 miles, and the speed of 15 miles in the intersections and curves and school zones was expressly included under a like rule. The Commissioner of the Interior was authorized to establish zones on public highways and fix speed limits therefor. Although it is not necessary to interpret the scope of this authority because it is not the point at issue herein, it is obvious that any speed limit provided by the Commissioner lower than those fixed in the statute could not constitute a public offense per se in view of the standard which was kept in force by the Act; and on the contrary any speed authorized thereby in excess of that fixed for each site would have been in conflict with the presumption.

We thus reach the amendment, in controversy, of § 15 of Act No. 279, made by Act No. 156 of April 26, 1951 (Sess. Laws, p. 368). The second sentence which formed part of the Basic Rule of Act No. 140 of 1940 (§ 20) was added to paragraph (a) containing the general standard of conduct appearing in the 1916 statute. Paragraph (b) was amended thus:

"(b) It shall be *unlawful* to operate a motor vehicle at a speed of more than twenty-five (25) miles an hour in the urban zone; or at a speed of more than fifteen (15) miles an hour in rounding a curve where the view is not clear at a distance of one hundred (100) meters towards the front; or in crossing an intersection at a speed of more than fifteen (15) miles an hour when the driver of the vehicle cannot clearly see the vehicles approaching or which may approach said intersection within a limit of fifty (50) meters in all directions, save in such intersections where traffic is regulated by traffic lights, in which case

the driver having the right to continue may do so at the speed fixed for the urban zone; or at a speed of more than fifteen (15) miles an hour when passing a district where public schools are located. The Commissioner of the Interior is hereby authorized to establish zones and fix speed limits therefor *within the limits fixed in this Act;* and when doing so he shall fix signs and notices indicating the maximum speed."

The foregoing amendment declared *unlawful* for the first time since 1916 the driving in excess of a specific speed fixed in the Act itself, and eliminated the portion concerning the 45 mile limit "in all other cases." It is very significant that upon abandoning the rule of prima facie evidence and declaring as illegal per se the act of driving in excess of the limits fixed in the statute, the lawmaker·eliminated as illegal the 45 mile limit that covered the rural zone. In other words, he left in force the legislative standard that governed since 1916, and again was remiss to make a public offense the act in itself of driving in a rural zone in excess of 45 miles, which were the original 48 kilometers. It is true that the 1951 amendment did not leave in force the prima facie evidence either but it extended to the rural zone perhaps a greater protection upon authorizing the Secretary of Public Works to *establish zones,* —in any place—fixing speed limits therefor *within the limits fixed in the Act.* Thus, the traditional public policy was harmonized with present exigencies, because with the tendency each time greater of the rural zone to lose its own configuration, particularly along the highways as a result of urban growth and industrial expansion, the problem now was not so much to distinguish between the urban and rural zones as such, but to face adequately the traffic problems in certain and specific places as it might be necessary. For example, in the rural zone wherever there is a traffic condition of congestion or danger similar to that of the urban zone because of the presence of housing developments or factories or any other conglomeration, the Secretary of Public Works was authorized to fix therein a maximum speed zone within the most sensible

limits provided in the Act for the urban zone. An example of the foregoing is provided by two of the complaints filed in this case which involved the rural zone in which for some adequate reason the Secretary had fixed the maximum speed limit of 25 miles specified for the urban zone. He was also authorized, even within the urban zone, to fix maximum limits lower than 25 miles whenever the circumstances warranted it, or even in the absence of a school, to fix speeds as those legally permitted for school zones, as may happen in a place where there is a church, recreation park or any other permanent activity with a large regular inflow of children and adults. It was impossible for the lawmaker to visualize, in order to insert them, all the unforeseen situations of that nature which would arise and he called upon the Secretary of Public Works to face them as they might arise. For that reason he authorized him (1) to establish zones, —all those which in his judgment might be necessary without any limitation whatever;— and (2) to fix speed limits, —those he believed more prudent and adequate,—*within the limits fixed in the Act.* Stated otherwise: the Secretary was authorized to establish in any part of the public roads and highways of Puerto Rico as many zones with maximum speed limit up to 25 miles as he deemed necessary, in addition to the zones expressly enumerated in the statute. That the word *"limits"*, notwithstanding the grammatical ellipsis, referred to the "speed" limits fixed in the Act, is shown by the provision which follows immediately with regard to the placement of signs indicating the speed thus fixed by the Secretary. The term could not refer to the general *standard* for controlling the speed contained in § 15(a), which provision is addressed to the *driver* who shall regulate the speed with due care, and not to the authorities. And should we conclude that the word *limits* bears no relation to the concept of speed, what limits contained in the Act did the lawmaker have in mind that were to be considered by the Secretary upon fixing the speed to the zones which he established?

According to the history of the legislation on traffic and the legislative policy which governed since the matter was regulated from the beginning of the century, the lawmaker never meant to make a public offense the mere act of driving at a certain speed, and when in 1951 he made such an act a public offense, he eliminated from the Act all reference to speed limits in a rural zone.[12]

The legislative intent emerges as clearly as it appears from the history of the legislation and from the literal text of the statute in the sense expressed, from the report of the Chairman of the Juridical Penal Committee on House Bill No. 650 amending §§ 13, 14 and 15 of Act No. 279 of 1946: "this bill tends to amend Act No. 279 of 1946, that is, the Traffic Act. It tends to place a higher penalty on those persons who drive while intoxicated and, likewise, to establish, to fix, that the Commissioner of the Interior may regulate traffic so as to determine *the speed limit in certain sections* in both urban and rural zones of Puerto Rico." (Italics supplied.) *Minutes of the House of Representatives*, 819 (1951). The report does not say that the purpose was for the Commissioner to regulate traffic fixing the maximum legal speed for driving in the highways not fixed in the Act, but rather —pursuant to the text of Bill No. 650,—that the Commissioner determine the *specific speed* that would prevail in certain sections (zones) which terms could only refer to the speed mentioned in the bill at issue. This part of the report made like reference to the urban zone which would have been unnecessary since the lawmaker himself fixed limit therefor. The fact that the Commissioner was not authorized to establish in a general and indiscriminative manner maximum speed limits in a rural zone would not leave this section without punishable regulation, because it was still an offense to violate the general rule of conduct contained in § 15 (a) ap-

---

[12] This does not mean that under § 21 of Act No. 279 the violation of any limit fixed with legal authority by the Secretary in the zones that he established is not a public offense.

plicable in all parts. *Cf. People* v. *López,* 77 P.R.R. 573; *People* v. *Negrón,* 79 P.R.R. 279, and cases cited previously. On the contrary in *People* v. *López,* we said (p. 588) that the fact that the statute [or regulation] fixes the maximum speed for vehicles, does not mean that they can run at any speed within the limit, even if death [or damage] ensues. In other words, that the fixing of a permissible speed limit does not constitute "full discretion"—*People* v. *López,* p. 579—which excludes the driver from not violating the standard of *due care* of § 15(a) on the ground that he keeps within that limit.

On October 24, 1956 [13] the Secretary of Public Works established a Regulation (1) establishing zones of speed limits in all those places where it was thus indicated by signs to that effect; (2) declaring it illegal to operate a motor vehicle in said zones at a speed higher than the one indicated; (3) decreeing that in all those rural zones of the highways and roads where by law or regulation something else had not been provided *it would be illegal* to drive a motor vehicle at a speed higher than 40 miles an hour; and (4) providing that persons who violated this regulation would be punished pursuant to the provisions of § 15(b) of Act No. 279 as amended, not pursuant to § 21. It is obvious that paragraph (3) declares illegal per se the driving in excess of 40 miles, not in a "zone" established by the Secretary as authorized, but where neither by law nor regulation something else was provided, which offense, as we have stated before, the lawmaker himself refused to create.

Notwithstanding the foregoing, there is in my opinion with respect to the problem of construction involved herein another more serious consideration which affects the decision

---

[13] In *People* v. *Pérez,* 79 P.R.R. 460, decided on June 26, 1956, we commented (p. 465) that the parties had not produced, nor had we been able to find, any regulation of the Secretary of Public Works concerning traffic on the public highways which, after promulgation, could have the force of law, and that therefore, we had to conclude that the only provision regulating traffic on public highways since 1951 applicable to that case was the general provision of § 15(a).

of this case. The Department itself accepted before the Superior Court "that the language of § 15 of the Automobile Act is not a model of clarity" adding that where the language of the statute is not entirely clear, the judge must seek the legislative intent and "the balance of social conveniences." Assuming that the statute was arbitrary in its letter, which in my opinion it was not,[14] I think I have shown that it was not the legislative intent to declare a public offense the driving itself in rural zones at speeds in excess of the limits fixed in the statute; and there prevails, over the balance of the "social conveniences", the more fundamental principle that a statute that imposes a criminal penalty or that gives rise to the imposition of penalty violates the guarantee of due process of law if it is arbitrary, indefinite or vague. Such situation of arbitrariness and vagueness of the statute would not permit, compatible with due process of law, the legal conviction of a defendant. *Preston* v. *Clements*, 232 S.W.2d 85 (Ky. 1950); *State* v. *Hines*, 182 P.2d 865 (Kan. 1947); *Phillips Petroleum Co.* v. *Anderson*, 74 So.2d 544 (Fla. 1954); *Little* v. *Young*, 82 N.Y.S.2d 909 (N. Y. 1948), conf. 87 N.E.2d 74; *Chapel* v. *Commonwealth*, 89 S.E.2d 337 (Va. 1955); *State* v. *Gottfried*, 127 N.E.2d 371 (Ohio 1955); *Demers* v. *Peterson*, 254 P.2d 213 (Or. 1953); *Osius* v. *City of St. Clair Shores*, 75 N.W.2d 25 (Mich. 1956); *School District No. 39 of Washington Co.* v. *Decker*, 68 N.W.2d 354 (Neb. 1955); *Borough of Oakland* v. *Roth*, 95 A.2d 422, aff'd 100 A.2d 698; *Lee* v. *Delmont*, 36 N.W.2d 530 (Minn. 1949); *State* v. *Gilroy*, 221 P.2d 549 (Wash. 1950); *South Carolina State Highway Dept.* v. *Harbin*, 86 S.E.2d 466 (S. C. 1955); *State* v. *Traffic Teleph. Workers' Federation*, 66 A.2d 616 (N. J. 1949); *Panamá Refining Co.* v. *Ryan*, 293 U. S. 388 (1935); See: Cyclopedia of Automobile Law and Practice (Blashfield) Part 1, 46, 51, § 23.

---

[14] See the legislative discussion on Act No. 1 of August 5, 1957. —9 Journal of Sessions, 2227–40, (Senate); 2288–2304 (House).—

Even in civil cases agencies are never elaborated by construction, nor taken for granted. *Gordils et al.* v. *Sucs. of Frontera, Ltd. et al.*, 21 P.R.R. 213; *Lokpez* v. *Lokpez*, 61 P.R.R. 596; *Baquero* v. *The Registrar of Property*, 22 P.R.R. 22. An examination of the several provisions which we find throughout the legislation on traffic delegating power to the administrative authority to implement some aspect of the law, shows that the authority was always granted in express language so as not to require construction as was done in Act No. 1 of August 5, 1957, granting the Secretary of Public Works the authority challenged herein. Based on the arbitrariness and indefiniteness of the statute every doubt must be decided in favor of the defendants as an inescapable sequel of the rule of innocence guaranteed by our Constitution, and of the principle, deeply rooted in the Anglo-Saxon judicial conscience which we have adopted as our own, that criminal statutes must be construed restrictively in favor of the citizen.[15] *Cf. Connally* v. *General Construction Co.*, 269 U. S. 385, 70 L. Ed. 322; *Watkins* v. *United States*, 354 U. S. 178; *Winters* v. *New York*, 333 U. S. 507; *Lanzetta* v. *New Jersey*, 306 U. S. 451; *United States* v. *Weitzel*, 246 U. S. 533; *Herndon* v. *Lowry*, 301 U. S. 242; *Todd* v. *United States*, 158 U. S. 278; *United States* v. *Harris*, 177 U. S. 305; *United*

---

[15] Pursuant to the traditional principle, in the recent case of *Ladner* v. *United States*, 358 U. S. 169, decided on December 15, 1958, upon concluding that § 254 of Title 18 USC could be read equally in the sense that a single discharge from a shotgun constituted a crime of assault without taking in consideration the number of federal officers affected, as in the sense that there were as many assaults committed as officers affected, the Supreme Court stated that when choice has to be made between two readings of what conduct Congress has made a crime, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication. Citations. . . . When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. Citations. . . . This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended."

*States* v. *Tandaric*, 152 F.2d 3, cert. den. 327 U. S. 786; *Cardiff* v. *United States*, 194 F.2d 686, affirmed, 344 U. S. 174; *United States* v. *Alpers*, 338 U. S. 680; *M. Kraus & Bros., Inc.* v. *United States*, 327 U. S. 614; See Annotation 96 L. Ed 374, 379; 83 L. Ed. 898; 97 L. Ed. 203; Crawford, Statutory Construction 460, § 240; 3 Sutherland, Statutory Construction, § 1604. *Cf. Pippinger* v. *State*, 34 N.E.2d 63; *Lewis* v. *State*, 247 S.W.2d 195.

Except for the jurisdictional problem, because I believe that the decision of the District Court exonerating the defendants from the commission of the public offense is neither appealable nor reviewable, I am of the opinion that the mere act of driving in a rural zone at a speed in excess of 50 miles per hour alleged in four of the complaints did not constitute *at that time* a public offense in the light of the provisions of § 15 (b) of Act No. 279 of 1946 as amended by Act No. 156 of 1951, since this provision in itself did not create such an offense nor authorized the Secretary of Public Works to fix, without restriction to any limit whatever, rates of permissible speed the violation of which would constitute a public offense.

